**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| TC TECHNOLOGY LLC, | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No. 16-153-RGA |
| | ) | |
| v. | ) | |
| | ) | |
| SPRINT CORPORATION AND SPRINT SPECTRUM, L.P., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**JOINT AMENDED PROPOSED FINAL JURY INSTRUCTIONS**

Date: December 1, 2019

## TABLE OF CONTENTS

1.      GENERAL INSTRUCTIONS ................................................................4

    **1.1** INTRODUCTION ...............................................................................4

    **1.2** JURORS' DUTIES .............................................................................5

    **1.3** BURDENS OF PROOF .......................................................................6

    **1.4** EVIDENCE DEFINED .......................................................................8

    **1.5** CONSIDERATION OF EVIDENCE ....................................................10

    **1.6** DIRECT AND CIRCUMSTANTIAL EVIDENCE .................................11

    **1.7** CREDIBILITY OF WITNESSES ........................................................12

    **1.8** EXPERT WITNESSES ......................................................................14

    **1.9** DEPOSITION TESTIMONY ..............................................................15

    **1.10** NUMBER OF WITNESSES ...............................................................16

    **1.11** EXHIBITS AND DEMONSTRATIVE EXHIBITS ...............................17

    **1.12** USE OF NOTES ...............................................................................18

2.      SUMMARY OF CONTENTIONS..........................................................19

3.      PATENT INFRINGEMENT ..................................................................21

    **3.1** PATENT CLAIMS ............................................................................21

    **3.2** OPEN-ENDED OR "COMPRISING" CLAIMS ....................................22

    **3.3** CONSTRUCTION OF CLAIMS .........................................................24

    **3.4** PATENT INFRINGEMENT—GENERALLY ........................................27

    **3.5** INFRINGEMENT...............................................................................29

    **3.6** INFRINGEMENT DESPITE SPRINT' IMPROVEMENTS....................30

    **3.7** JOINT, LITERAL INFRINGEMENT....................................................32

    **3.8** INFRINGEMENT BY THE DOCTRINE OF EQUIVALENTS ..............33

4.      INVALIDITY ......................................................................................39

**4.1** INVALIDITY GENERALLY ................................................................39

**4.2** PERSPECTIVE OF ONE OF ORDINARY SKILL IN THE ART ..........................40

**4.3** PRIOR ART ..............................................................................42

**4.4** ANTICIPATION ..........................................................................45

**4.5** OBVIOUSNESS ..........................................................................51

**4.6** WRITTEN DESCRIPTION ................................................................58

**4.7** ENABLEMENT ..........................................................................60

**4.8** INDEFINITENESS ......................................................................62

**5.** DAMAGES ..................................................................................64

**5.1** DAMAGES INTRODUCTION ..............................................................64

**5.2** REASONABLE ROYALTY—DEFINITION [[Sprint proposes adding: AND "HYPOTHETICAL NEGOTIATION"]] ........................................67

**5.3** FACTORS FOR DETERMINING REASONABLE ROYALTY ..........................72

**5.4** REASONABLE ROYALTY—PATENT EXPIRATION ........................................77

**5.5** REASONABLE ROYALTY—APPORTIONMENT ..............................................78

**5.6** REASONABLE ROYALTY—USE OF COMPARABLE TRANSACTIONS GRANTING PATENT RIGHTS ..............................................81

**6.** DELIBERATION AND VERDICT ............................................................83

**6.1** INTRODUCTION ........................................................................83

**6.2** UNANIMOUS VERDICT ..................................................................84

**6.3** DUTY TO DELIBERATE ..................................................................85

**6.4** SOCIAL MEDIA ........................................................................86

**6.5** COURT HAS NO OPINION ..............................................................87

## 1.   **GENERAL INSTRUCTIONS**[1]

### 1.1  INTRODUCTION

Members of the jury, now it is time for me to instruct you about the law that you must follow in deciding this case.

I will start by explaining your duties and the general rules that apply in every civil case.

Then I will explain some rules that you must use in evaluating particular testimony and evidence.

Then I will explain the positions of the parties and the law you will apply in this case. And last, I will explain the rules that you must follow during your deliberations in the jury room, and the possible verdicts that you may return.

Please listen very carefully to everything I say. In following my instructions you must follow all of them and not single out some and ignore others. They are all important.

You will have your written copy of these instructions with you in the jury room for your reference during your deliberations. You will also have a verdict form, which will list the questions that you must answer to decide this case.

**AUTHORITY**:   *Sprint Commc'ns Co. L.P. v. Comcast Cable Commc'ns, LLC*, No. 1:12-cv-01013-RGA (D. Del. Feb. 5, 2015), D.I. 264 (final jury instructions) Instruction 1.1 at 1; *Bio-Rad Labs., Inc. v. 10X Genomics, Inc*., No. 1:15-cv-00152-RGA, (D. Del. Nov. 13, 2018), D.I. 470 (final jury instructions), Instruction 1.1 at 3.

---

[1] In this document, instructions with no notations are agreed proposed instructions. Disputed instructions are noted as either **[[TC Tech's Proposal: ... ]]**, or **[[Sprint's Proposal: ... ]].**

## 1.2  JURORS' DUTIES

You have two main duties as jurors. The first one is to decide what the facts are from the evidence that you saw and heard here in court. Deciding what the facts are is your job, not mine, and nothing that I have said or done during this trial was meant to influence your decision about the facts in any way.

Your second duty is to take the law that I give you, apply it to the facts, and decide the issues presented to you on the verdict form. It is my job to instruct you about the law, and you are bound by the oath that you took at the beginning of the trial to follow the instructions that I give you, even if you personally disagree with them. This includes the instructions that I gave you before and during the trial, and these instructions. All the instructions are important, and you should consider them together as a whole.

Perform these duties fairly. Do not let any bias, sympathy or prejudice that you may feel toward one side or the other influence your decision in any way.

**AUTHORITY**:     *Sprint Commc'ns Co. L.P. v. Comcast Cable Commc'ns, LLC*, No. 1:12-cv-01013-RGA (D. Del. Feb. 5, 2015), D.I. 264 (final jury instructions), Instruction 1.2 at 2; *Bio-Rad Labs., Inc. v. 10X Genomics, Inc*., No. 1:15-cv-00152-RGA, D.I. 470 (D. Del. Nov. 13, 2018), D.I. 470 (final jury instructions), Instruction 1.2 at 4.

### 1.3  BURDENS OF PROOF[2]

For each issue in this case, either TC Tech or Sprint bears the burden of proof, which means that it bears the burden of persuading you to find in its favor. In a patent case such as this, there are two different burdens of proof. The first is called "preponderance of the evidence." The second is called "clear and convincing evidence."

For any issue on which a party bears the burden of proof by a preponderance of the evidence, that party has carried its burden if you find that what the party claims is more likely true than not, when considered in light of all of the evidence. To put it differently, if you were to put each party's evidence on the opposite sides of a scale, the evidence supporting the party with the burden of proof would have to make the scales tip somewhat on the side of that party.

Here, TC Tech has the burden of proving by a preponderance of the evidence that Sprint infringed claim 1 or claim 2 of the '488 patent, and the amount of damages TC Tech should receive to compensate it for any infringement.

For any issue on which a party bears the burden of proof by clear and convincing evidence, that party has carried its burden if you find that what the party claims is highly probable, when considered in light of all of the evidence. Proof by clear and convincing evidence is a higher burden than proof by a preponderance of the evidence.

Here, Sprint has the burden of proving by clear and convincing evidence that claim 1 and claim 2 of the '488 patent are invalid.

---

[2] **Sprint's footnote:** This instruction is identical to section "1.9 Burdens of Proof" of the proposed preliminary instruction (in both agreed and disputed parts).

**[[Sprint's Proposal:** Those of you who have sat on criminal cases will have heard of proof beyond a reasonable doubt. That requirement does not apply to a civil case; therefore, you should put it out of your mind.]][3]

**AUTHORITY**:   Bio-Rad Labs., Inc. v. 10X Genomics, Inc., No. 1:15-cv-00152-RGA (D. Del. Nov. 13, 2018), D.I. 470 (final jury instructions), Instruction 2 at 6.

**AUTHORITY FOR SPRINT'S ADDITIONAL INSTRUCTION:**
Judge Sleet's Model Preliminary Jury Instructions- Patent (Rev: 3/ 16/10), at 5; Uniform Jury Instructions for Patent Cases in the United States District Court for the District of Delaware (March 1993), at 8 ("Burden of Proof"); Third Circuit Model Jury Instructions ("Chapters 1, 2 & 3: for Civil Cases") (Oct. 2017), at 19.

---

[3] **Sprint's footnote:** This is the same proposal Sprint offered for section "1.9 Burdens of Proof" of the proposed preliminary instructions

## 1.4  EVIDENCE DEFINED

**[[TC Tech's Proposal:** You must make your decision based only on the evidence that you saw and heard here in court. Do not let rumors, suspicions, or anything else that you may have seen or heard outside of court influence your decision in any way.

The evidence in this case includes only what the witnesses said while they were testifying under oath, the exhibits that I allowed into evidence.

Nothing else is evidence. The lawyers' statements and arguments are not evidence. Their questions and objections are not evidence. My legal rulings are not evidence. My comments and questions are not evidence.

During the trial I may have not let you hear the answers to some of the questions that the lawyers asked. I also may have ruled that you could not see some of the exhibits that the lawyers wanted you to see. And sometimes I may have ordered you to disregard things that you saw or heard, or I struck things from the record. You must completely ignore all of these things. Do not even think about them. Do not speculate about what a witness might have said or what an exhibit might have shown. These things are not evidence, and you are bound by your oath not to let them influence your decision in any way. Sometimes testimony and exhibits are received only for a limited purpose. When I give an instruction regarding that limited purpose, you must follow it.

Make your decision based only on the evidence, as I have defined it here, and nothing else.**]]**

**[[Sprint's Proposal**: repeat the "1.4 Evidence Defined" section from the proposed preliminary instructions.**]]**[4]

---

[4]  **Sprint's footnote:** This would make the final instruction identical to the proposed (agreed) preliminary instruction.

**AUTHORITY FOR TC TECH'S PROPOSAL**:

> *Sprint Commc'ns Co. L.P. v. Comcast Cable Commc'ns*, LLC, No. 1:12-cv-01013-RGA (D. Del. Feb. 5, 2015), D.I. 264 (final jury instructions) Instruction 1.4 at 4.

**AUTHORITY FOR SPRINT's PROPOSAL**:

> *Bio-Rad Labs., Inc. v. 10X Genomics, Inc*., No. 1:15-cv-00152-RGA (D. Del. Oct. 23, 2018), D.I. 388 (preliminary jury instructions), Instruction 1.4 at 6-7.

## 1.5  CONSIDERATION OF EVIDENCE

You should use your common sense in weighing the evidence. Consider it in light of your everyday experience with people and events, and give it whatever weight you believe it deserves. If your experience tells you that certain evidence reasonably leads to a conclusion, you are free to reach that conclusion.

**AUTHORITY**:     *Sprint Commc'ns Co. L.P. v. Comcast Cable Commc'ns, LLC*, No. 1:12-cv-01013-RGA (D. Del. Feb. 5, 2015), D.I. 264 (final jury instructions) Instruction 1.5 at 5.

## 1.6  DIRECT AND CIRCUMSTANTIAL EVIDENCE

[[**TC Tech's Proposal:** There are two kinds of evidence: direct evidence and circumstantial evidence. Direct evidence is direct proof of a fact, such as the testimony of an eyewitness. For example, if a witness testified that she saw it raining outside, and you believed her, that would be direct evidence that it was raining.

Circumstantial evidence is indirect proof of a fact, i.e., proof of facts from which you may infer or conclude that other facts exist. For example, if someone walked into the courtroom wearing a raincoat covered with drops of water and carrying a wet umbrella, that would be circumstantial evidence from which you could conclude that it was raining.

The law makes no distinction between the weight that you should give to either direct and circumstantial evidence, nor does it say that one type of evidence is any better evidence than the other. You should consider all the evidence, both direct and circumstantial, and give it whatever weight you believe it deserves.]]

[[**Sprint's Proposal**: repeat the "1.5 Direct and Circumstantial Evidence" section from the preliminary instructions.]][5]

**AUTHORITY FOR TC TECH'S PROPOSAL:**
> *Sprint Commc'ns Co. L.P. v. Comcast Cable Commc'ns, LLC*, No. 1:12-cv-01013-RGA (D. Del. Feb. 5, 2015), D.I. 264 (final jury instructions) Instruction 1.6 at 6.

**AUTHORITY FOR SPRINT'S PROPOSAL:**
> *Bio-Rad Labs., Inc. v. 10X Genomics, Inc.*, No. 1:15-cv-00152-RGA (D. Del. Oct. 23, 2018), D.I. 388 (preliminary jury instructions) Instruction 1.5 at 8.

---

[5] **Sprint's footnote:** This would make the final instruction identical to the proposed (agreed) preliminary instruction.

## 1.7  CREDIBILITY OF WITNESSES

[[**TC Tech's Proposal:** You are the sole judges of each witness's credibility. You should consider each witness's means of knowledge; strength of memory; opportunity to observe; how reasonable or unreasonable the testimony is; whether it is consistent or inconsistent; whether it has been contradicted; the witness's biases, prejudices, or interests; the witness's manner or demeanor on the witness stand; and all circumstances that, according to the evidence, could affect the credibility of the testimony. ]]

[[**Sprint's Proposal**: repeat the "1.6 Credibility of Witnesses" section from the preliminary instructions.]][6]

If you find the testimony to be contradictory, you must try to reconcile it, if reasonably possible, so as to make one harmonious story of it all. But if you cannot do this, then it is your duty and privilege to believe the portions of testimony that, in your judgment, are most believable and disregard any testimony that, in your judgment, is not believable.

In determining the weight to give to the testimony of a witness, you should ask yourself whether there was evidence tending to prove that the witness testified falsely about some important fact, or, whether there was evidence that at some other time the witness said or did something, or failed to say or do something that was different from the testimony he gave at the trial.

You should remember that a simple mistake by a witness does not necessarily mean that the witness was not telling the truth. People may tend to forget some things or remember other things inaccurately. If a witness has made a misstatement, you must consider whether it was simply

---

[6] **Sprint's footnote:** This would make the first portion final instruction (which is currently disputed) identical to the proposed (agreed) preliminary instruction in section "1.6 Credibility of Witnesses" of the proposed (agreed) preliminary instructions.

an innocent lapse of memory or an intentional falsehood, and that may depend upon whether it

concerns an important fact or an unimportant detail.

**AUTHORITY FOR AGREED PORTION OF INSTRUCTION:**

> *Sprint Commc'ns Co. L.P. v. Comcast Cable Commc'ns, LLC*, No. 1:12-cv-01013-RGA (D. Del. Feb. 5, 2015), D.I. 264 (final jury instructions) Instruction 1.7 at 7.

**AUTHORITY FOR TC TECH'S PROPOSAL**:

> *Sprint Commc'ns Co. L.P. v. Comcast Cable Commc'ns, LLC*, No. 1:12-cv-01013-RGA (D. Del. Feb. 5, 2015), D.I. 264 (final jury instructions) Instruction 1.7 at 7.

**AUTHORITY FOR SPRINT'S PROPOSAL**:

> *Bio-Rad Labs., Inc. v. 10X Genomics, Inc.*, No. 1:15-cv-00152-RGA (D. Del. Oct. 23, 2018), D.I. 388 (preliminary jury instructions), Instruction 1.6 at 9.

## 1.8  EXPERT WITNESSES[7]

When knowledge of technical subject matter may be helpful to the jury, a person who has special training or experience in that technical field—called an expert witness—is permitted to state his or her opinion on those technical matters. However, you are not required to accept that opinion. As with any other witness, it is up to you to decide whether to rely upon it.

In weighing expert testimony, you may consider the expert's qualifications, the reasons for the expert's opinions, and the reliability of the information supporting the expert's opinions, as well as the factors I have previously mentioned for weighing testimony of any other witness. Expert testimony should receive whatever weight and credit you think appropriate, given all the other evidence in the case. You are free to accept or reject the testimony of experts, just as with any other witness.

**AUTHORITY**:    *Sprint Commc'ns Co. L.P. v. Comcast Cable Commc'ns, LLC*, No. 1:12-cv-01013-RGA (D. Del. Feb. 5, 2015), D.I. 264 (final jury instructions) Instruction 1.9 at 9; *Bio-Rad Labs., Inc. v. 10X Genomics, Inc.*, No. 1:15-cv-00152-RGA (D. Del. Oct. 23, 2018), D.I. 388 (preliminary jury instructions), Instruction 1.7 at 10.

---

[7] **Sprint's footnote:** This final instruction is identical to section "1.7 Expert Witnesses" of the proposed preliminary instructions

## 1.9  DEPOSITION TESTIMONY

During the trial, certain testimony was presented to you through depositions that were read into evidence or electronically played. This testimony must be given the same consideration that you would give it had the witness personally appeared in court. Like the testimony of a live witness, the statements made in a deposition are made under oath and are considered evidence that may be used to prove particular facts.

**AUTHORITY**:     *Amgen Inc. v. Sanofi*, No. 14-1317 (D. Del. Feb. 25, 2019), D.I. 812 (final jury instructions), Instruction 9 at 6.

## 1.10  NUMBER OF WITNESSES

One more point about the witnesses. Sometimes jurors wonder if the number of witnesses who testified makes any difference.

Do not make any decisions based only on the number of witnesses who testified. What is more important is how believable the witnesses were, and how much weight you think their testimony deserves. Concentrate on that, not the numbers.


**AUTHORITY**:        *Sprint Commc'ns Co. L.P. v. Comcast Cable Commc'ns*, LLC, No. 1:12-cv-01013-RGA (D. Del. Feb. 5, 2015), D.I. 264 (final jury instructions) Instruction 1.8 at 8.

## 1.11  EXHIBITS AND DEMONSTRATIVE EXHIBITS

During the course of the trial, you have seen many exhibits. Many of these exhibits were admitted as evidence. Some of these admitted exhibits or portions of them have been displayed for you on a screen and you will have these admitted exhibits, whether displayed on a screen or not, in the jury room during your deliberations.

There are other exhibits (including charts and animations presented by attorneys and witnesses) that were offered to help illustrate the testimony of the various witnesses. These illustrations, called "demonstrative exhibits," have not been admitted as evidence, are not evidence, and should not be considered as evidence. Rather, it is the underlying testimony of the witness that you heard when you saw the demonstrative exhibits that is the evidence in this case.


**AUTHORITY**:        *Bio-Rad Labs., Inc. v. 10X Genomics, Inc.*, No. 1:15-cv-00152-RGA (D. Del. Nov. 13, 2018), D.I. 470 (final jury instructions), Instruction 1.3 at 5.

## 1.12  USE OF NOTES

You may use notes taken during trial to assist your memory. However, you should use caution in consulting your notes. There is always a tendency to attach undue importance to matters that you have written down. Some testimony that is considered unimportant at the time presented, and thus not written down, takes on greater importance later on in the trial in light of all the evidence presented. Therefore, you are instructed that your notes are only a tool to aid your own individual memory, and you should not compare notes with other jurors in determining the content of any testimony or in evaluating the importance of any evidence.

Your notes are not evidence, and are by no means a complete outline of the proceedings or a list of the highlights of the trial.

Do not use your notes, or any other juror's notes, as authority to persuade fellow jurors. In your deliberations, give no more and no less weight to the views of a fellow juror just because that juror did or did not take notes. They are valuable, if at all, only as a way to refresh your memory. Your memory is what you should be relying on when it comes time to deliberate and render your verdict in this case.

Above all, your memory should be the greatest asset when it comes time to deliberate and render a decision in this case.


**AUTHORITY**:      *Sprint Commc'ns Co. L.P. v. Comcast Cable Commc'ns, LLC*, No. 1:12-cv-01013-RGA (D. Del. Feb. 5, 2015), D.I. 264 (final jury instructions) Instruction 1.11 at 11; *Bio-Rad Labs., Inc. v. 10X Genomics, Inc.*, No. 1:15-cv-00152-RGAD. Del. Oct. 23, 2018), D.I. 388 (preliminary jury instructions), Instruction 1.10 at 13.

## 2.   <u>SUMMARY OF CONTENTIONS</u>

There is one patent for your consideration in this case: U.S. Patent No. 5,815,488. I will refer to this patent as the "'488 patent" or the "asserted patent."

**[[TC Tech's Proposal:** TC Tech alleges that Sprint infringed claims 1 and 2 of the '488 patent by offering LTE data services. Sprint denies these assertions, and alleges that claims 1 and 2 of the '488 patent are invalid. TC Tech denies these assertions.**]]**

**[[Sprint's Proposal:** TC Tech claims that Sprint's LTE data services infringed claims 1 and 2 of the '488 patent. Sprint denies TC Tech's claims of infringement. Sprint also contends that claims 1 and 2 of the '488 patent are invalid.

Your job will be to decide: (1) whether TC Tech has proven by a preponderance of the evidence that Sprint has infringed either claim 1 or claim 2 of the '488 patent; and (2) whether Sprint has proven by clear and convincing evidence that either claim 1 or claim 2 of the '488 patent is invalid.

If you decide that any of the asserted claims has been infringed and is not invalid, you will then need to decide any monetary damages to be awarded to TC Tech to compensate for the infringement.**]]**[8]

**AUTHORITY FOR TC TECH'S PROPOSAL**:

> *Sprint Commc'ns Co. L.P. v. Comcast Cable Commc'ns, LLC*, No. 1:12-cv-01013-RGA (D. Del. Feb. 5, 2015), D.I. 264 (final jury instructions) Instruction 2.2 at 13; *Comcast IP Holdings I, LLC v. Sprint Commc'ns Co. L.P.*, No. 1:12-cv-00205-RGA (D. Del. Oct. 14, 2014), D.I. 332 (final jury instructions) Instruction 2.2 at 13; *E.I. Du Pont De Nemours & Co. v. Unifrax I LLC*, No. 1:14-cv-01250-RGA (D. Del. May 15, 2017), D.I. 325 (final jury instructions) Instruction 2.1 at 13.

---

[8] **Sprint's footnote:** Sprint's proposal is identical to agreed instructions in section "1.2 The Parties and Their Contentions" of the proposed preliminary instructions, with the exception that the phrase "Sprint's LTE data services" was added.

**AUTHORITY FOR SPRINT'S PROPOSAL**:

*Bio-Rad Labs., Inc. v. 10X Genomics, Inc*., No. 1:15-cv-00152-RGA (D. Del. Oct. 23, 2018),D.I. 388 (preliminary jury instructions), Instruction 1.2 at 2-3; The Federal Circuit Bar Association Model Patent Jury Instructions (July 2016), at 4.

### 3.   **PATENT INFRINGEMENT**

### 3.1  PATENT CLAIMS

Before you can decide the issues in this case, you will have to understand the patent

"claims." The patent claims are the numbered paragraphs at the end of the patent. These claims

are intended to define, in words, the boundaries of the invention described and illustrated in the

patent. Only the claims of the patent can be infringed. Neither the specification, which is the

written description of the invention, nor the drawings of a patent can be infringed. Infringement is

determined by comparing Sprint's method for providing LTE data services with each claim being

asserted by TC Tech. Each of the claims must be considered individually, and TC Tech need only

establish that one claim has been infringed. To show non-infringement of a particular claim by

Sprint's method for providing LTE data services, Sprint need only show that a single step of that

claim is missing from Sprint's method.

In patent law, the requirements of a claim are often referred to as "steps," "claim elements,"

or "claim limitations." When a method meets each and every claim limitation, the claim is said to

"cover" that method, and that method is said to "fall" within the scope of that claim.


**AUTHORITY**:     *Sprint Commc'ns Co. L.P. v. Comcast Cable Commc'ns*, LLC, No. 1:12-cv-
01013-RGA (D. Del. Feb. 5, 2015), D.I. 264 (final jury instructions)
Instruction 3.1 at 14; *see generally, Bio-Rad Labs., Inc. v. 10X Genomics,
Inc*., No. 1:15-cv-00152-RGA (D. Del. Nov. 13, 2018), D.I. 470 (final jury
instructions), Instruction 3.1 at 7, Instruction 3.5 at 11.

### 3.2  OPEN-ENDED OR "COMPRISING" CLAIMS

[[**TC Tech's Proposal:** The preamble to a claim is an introductory statement that names the invention that is to be claimed. For example, in claim 1 of the '488 patent, the preamble is: "A method for enabling a plurality of remote locations to transmit data to a central location comprising . . . ." This preamble, as with the preamble of all asserted claims against Sprint, uses the transitional phrase "comprising." "Comprising" is interpreted the same as "including" or "containing."

Use of the term "comprising" in a patent claim makes the claim open-ended. In other words, the claim is not limited to only what is in the claim. Based on this explanation, if you find that Sprint's method for providing LTE data services meets all of the requirements of an asserted claim, the fact that it may also include additional elements is irrelevant. The presence of additional elements does not mean that Sprint does not infringe a patent claim. ]]

[[**Sprint's Proposal:** Both asserted claims use the word "comprising."

"Comprising" is interpreted the same way as "including" or "containing." Use of the term "comprising" in a patent claim makes the claim open-ended. In other words, the claim is not limited to the steps that are recited in the claim, but also covers methods having all of the recited steps and additional steps not recited in the claim. Therefore, if you find that an accused method includes all of the steps of a claim, the fact that the accused method might include additional steps would not avoid infringement of the claim, so long as the presence of the additional method steps does not negate an element of the claim. However, if an accused method performs steps that are explicitly moved outside the scope of the claims as construed, then that method does not infringe, even if the preamble of the asserted claim uses the transitional phrase "comprising."]]

**AUTHORITY FOR TC TECH'S PROPOSAL:**

*Sprint Commc'ns Co. L.P. v. Comcast Cable Commc'ns*, LLC, No. 1:12-cv-01013-RGA (D. Del. Feb. 5, 2015), D.I. 264 (final jury instructions), Instruction 3.3 at 17.

**AUTHORITY FOR SPRINT'S PROPOSAL**:

*Kustom Signals, Inc. v. Applied Concepts, Inc*., 264 F.3d 1326, 1332 (Fed. Cir. 2001); *EMC Corp. v. Zerto, Inc*., No. 1:12-cv-00956-GMS (D. Del. May 6, 2015), D.I. 208 (final jury instructions) Instruction 3.4 at 22; *E.I. Du Pont De Nemours & Co. v. Unifrax I LLC*, No. 1:14-cv-01250-RGA (D. Del. May 15, 2017), D.I. 325 (final jury instructions) Instruction 3.3 at 16; *Ioengine, LLC v. Interactive Media Corp. d/b/a Kanguru Solutions,* No. 1:14-cv-01571 (D. Del. Jan. 17, 2017), D.I. 157 (final jury instructions) Instruction 3.4 at 22; *Bio-Rad Labs., Inc. v. 10X Genomics, Inc*., No. 1:15-cv-00152-RGA (D. Del. Nov. 13, 2018), D.I. 470 (final jury instructions), Instruction 3.4 at 10.

### 3.3  CONSTRUCTION OF CLAIMS

The law says that it is the Court's duty to define the terms of the patent's claims. I have already defined the meaning of some of the words of the patent claims in this case. These definitions have been provided to you on a chart placed in your Juror Notebooks.

[[**Sprint's Additional Proposed Instruction:** For the purposes of making a record, Sprint offers the following claim constructions:

| Term or Phrase | Sprint's Proposed Construction |
| --- | --- |
| "the subsets of baseband frequencies allocated to each remote location being mutually exclusive" | "for any given time slot, no individual baseband frequency is allocated to more than one location"<br><br>The claimed "allocat[ion]" is not limited to a single allocation process.<br><br>The phrase "each remote location" does not mean "each remote location that's been allocated a subset of orthogonal baseband frequencies from the same set of orthogonal baseband frequencies." |
| "central location" | A  "central location" is a physical site containing the equipment used to communicate with each and every remote location in communication with that site. The "central location" includes all of the equipment at the physical site, not just one or more subsets of the equipment, components, and processes located at the site. In a cellular network, the "central location" is a cellular base station. |
| "data" | The claimed "data" is not limited to "user data." To the contrary, the claimed "data" includes all types of "data," including control data. |
| "particular baseband frequency" | The term "particular baseband frequency" is limited to one baseband frequency |

| Term or Phrase | Sprint's Proposed Construction |
| --- | --- |
| "said carrier signal having the same carrier frequency for each remote location" | The phrase "having the same carrier frequency for each remote location" requires every remote location to use the same carrier frequency.

The phrase "having the same carrier frequency for each remote location" means the same carrier frequency is used by each and every "remote location" that transmits data to the "central location." |

]][9]

You must accept my definition of these words in the patent claims as correct. You must use the definitions I give you for each claim to make your decisions as to whether the claim is infringed. You must ignore any different definitions used by the witnesses or the attorneys. You should not take my definition of the language of the patent claims as an indication that I have a view regarding how you should decide the issue of infringement or invalidity issues that you are being asked to decide. These issues are yours to decide. For any words in the claim for which I have not provided you with a definition, you should apply their common meaning.

You will have your Juror Notebooks with you in the jury room.

**AUTHORITY FOR AGREED INSTRUCTIONS:**

> *Sprint Commc'ns Co. L.P. v. Comcast Cable Commc'ns, LLC*, No. 1:12-cv-01013-RGA (D. Del. Feb. 5, 2015), D.I. 264 (final jury instructions) Instruction 3.4 at 18; *Bio-Rad Labs., Inc. v. 10X Genomics, Inc.*, No. 1:15-cv-00152-RGA (D. Del. Nov. 13, 2018), D.I. 470 (final jury instructions), Instruction 3.3 at 9.

---

[9] **TC Tech footnote:** TC Tech objects to Sprint's additional proposed instruction. It does not reflect the Court's claim construction order, but reflects previously rejected claim construction arguments, or arguments never previously raised with TC Tech or the Court.  In addition, reading any claim construction at this point would be unduly confusing. TC Tech requests that the Court provide the jury with its *actual* claim construction order in its usual manner.

**AUTHORITY FOR SPRINT'S PROPOSAL:**

> *TC Tech. v Sprint*, No. 1:16-cv-153-RGA, D.I. 95 (D. Del. Sept. 27, 2017)(claim construction order); *TC Tech. v Sprint*, No. 1:16-cv-153-RGA, D.I. 71 (D. Del. Aug. 10, 2017)(joint claim construction brief); *TC Tech. v Sprint*, No. 1:16-cv-153-RGA, D.I. 354 at 13 (D. Del. Apr. 15, 2019).

### 3.4  PATENT INFRINGEMENT—GENERALLY[10]

Patent law provides that any person or business entity which makes, uses, sells, or offers to sell, without the patent owner's permission any product, apparatus or method covered by at least one claim of a U.S. patent before the patent expires, infringes that patent. A patent owner may enforce his right to exclude others from making, using, selling, or offering to sell the patented invention by filing a lawsuit for patent infringement.

**[[TC Tech's Proposal:** Here, TC Tech owns the '488 patent and asserts that Sprint infringed claims 1 and 2 of the '488 patent by selling and offering to sell services on Sprint's LTE data services network. To prove infringement, TC Tech must prove by a preponderance of the evidence that Sprint's method for providing LTE data services meets all of the elements of claim 1 or claim 2 of the '488 patent. Infringement is assessed on a claim-by-claim basis.

I will now instruct you on the specific rules you must follow to determine whether TC Tech has proven that Sprint has infringed one or more of the asserted claims.**]]**

[[**Sprint's Proposal:** In this case, TC Tech asserts that Sprint infringed claims 1 and 2 of the '488 patent by selling and offering to sell services on Sprint's LTE data services network. In order to prove infringement, TC Tech must prove that the requirements of infringement are met by a preponderance of the evidence.

Infringement is assessed on a claim-by-claim basis. Therefore, there may be infringement as to one claim but no infringement as to another. To determine infringement, you must compare Sprint's method for providing LTE data services with each claim that TC Tech asserts is infringed, using my instructions as to the meaning of the patent claims. A patent claim is infringed only if Sprint's method

---

[10]  **Sprint footnote:** Sprint asserts that this section should be entitled "Patent Infringement" and that Sprint's Proposal makes the need for the additional subsequent section ("3.5 Infringement") unnecessary.

for providing LTE data services include each and every requirement or step in that patent claim.

If Sprint's method for providing LTE data services do not perform one or more steps recited in a

claim, then Sprint does not infringe that claim. **]]**

**AUTHORITY FOR TC TECH'S PROPOSAL:**

> *Sprint Commc'ns Co. L.P. v. Comcast Cable Commc'ns, LLC*, No. 1:12-cv-01013-RGA (D. Del. Feb. 5, 2015), D.I. 264 (final jury instructions) Instruction 3.5 and 3.6 at 19-20; and *Comcast IP Holdings I, LLC v. Sprint Commc'ns Co. L.P.*, No. 1:12-cv-00205-RGA (D. Del. Oct. 14, 2014), D.I. 332 (final jury instructions) 3.5 and 3.6 at 19-20.

**AUTHORITY FOR SPRINT'S PROPOSAL:**

> *Bio-Rad Labs., Inc. v. 10X Genomics, Inc.*, No. 1:15-cv-00152-RGA (D. Del. Nov. 13, 2018), D.I. 470 (final jury instructions), Instructions 3.5-3.6 at 11-12.

**[[TC Tech's Proposal:**

### 3.5  INFRINGEMENT[11]

To prove infringement of an asserted claim, TC Tech must show by a preponderance of the evidence that Sprint's method for providing LTE data services practiced every step of that claim. In other words, a claim is infringed if a method practices each and every step of the claim. You must compare Sprint's method for providing LTE data services with each and every one of the requirements of each claim to determine whether all of the requirements of the claim are met. If a method fails to practice any step in a recited claim, that method does not infringe that claim.

You must determine infringement with respect to each claim individually. You need not find that Sprint infringes every claim in TC Tech's patent to find infringement. A patent is infringed if even one claim has been infringed.**]]**


**AUTHORITY FOR TC TECH'S PROPOSAL:**

> *Sprint Commc'ns Co. L.P. v. Comcast Cable Commc'ns, LLC*, No. 1:12-cv-01013-RGA (D. Del. Feb. 5, 2015), D.I. 264 (final jury instructions) Instruction 3.6 at 20 (with irrelevant portions omitted).

---

[11] **Sprint footnote**: Sprint believes that its proposal for section 3.4 renders this section superfluous, and it should therefore be removed if Sprint's proposal is adopted.

[[TC Tech's proposal:

### 3.6  INFRINGEMENT DESPITE SPRINT' IMPROVEMENTS

You may find that Sprint's method for providing LTE data services represents an improvement over an invention defined in TC Tech's patent claims. However, you are not to presume that these facts means that the accused method cannot infringe TC Tech's patent claims. As long as the accused method includes all of the elements of at least one of TC Tech's asserted patent claims, then that asserted patent claim is infringed by the accused method despite Sprint's improvements.]] [12]

**[[Sprint does not believe the instruction, above, is appropriate in this case. However, should the Court decide to include the instruction, Sprint requests the addition of the following language:**

However, if the improvements negate an element of the claim, this renders the accused method non-infringing. **]]**

**AUTHORITY FOR TC TECH'S PROPOSAL:**
> *LG Electronics, Inc. v. ASKO Appliances Inc., et al.*, No. 1-08-cv-00828-RGA (D. Del. Nov. 29, 2012), D.I. 711 (final jury instructions) Instruction 3.4.3 at 21; *Siemens Med. Sols. USA, Inc. v. Saint-Gobain Ceramics & Plastics, Inc.*, 647 F.3d 1373, 1375–76 (Fed. Cir. 2011) ("Inventing an improvement to patented inventions, however, does not entitle such an inventor to infringe the underlying patented technology.").

**AUTHORITY FOR SPRINT'S ADDITIONAL PROPOSAL, IF NEEDED:**

---

[12] **Sprint's footnote:** Sprint objects to this instruction in its entirety as unduly prejudicial and confusing to the jury.  The element-by-element infringement analysis remains the same, regardless of whether or not Sprint's methods are arguably an "improvement." The issue is simply whether or not Sprint's accused method infringes the claims. There is no need to instruct the jury on "improvements."

*EMC Corp. v. Zerto, Inc.*, 1:12-cv-00956-GMS (D. Del. May 6, 2015), D.I. 208 (final jury instructions), Instruction 3.11 at 30.

### 3.7  JOINT, LITERAL INFRINGEMENT

Direct infringement occurs where all steps of a claimed method are performed by or are attributable to a single party. Where more than one party is involved in practicing the steps, you must determine whether the acts of one are attributable to the other such that a single party is responsible for the infringement. There are two situations where there may be direct infringement if no single party performs all of the steps of a claimed process but more than one party performs every step of the process: (1) the parties have formed a joint enterprise or (2) one party directs or controls another party's performance of the claim steps.

To prove that the alleged infringers have formed a joint enterprise, TC Tech must prove four elements:

(1)     there was an agreement, either express or implied, between Sprint and [**TC Tech**: another party] [**Sprint**: its customers];

(2)     they shared a common purpose;

(3)     each had a financial interest in that purpose; and

(4)     each had a right of control in the enterprise.

To prove that Sprint directed or controlled the acts of [**TC Tech**: another party] [**Sprint**: its customers], TC Tech must prove either: (i) that Sprint instructed [**TC Tech**: another party] [**Sprint**: its customers] to perform the claim step(s) or (ii) that Sprint conditioned [**TC Tech**: another party's] [**Sprint:** its customers'] participation in an activity or receipt of a benefit upon the performance of the claim step(s) and established how or when the claim step(s) were performed.

**AUTHORITY:**

N.D. Cal. Model Patent Jury Instructions B.3.3a; *Akamai Technologies, Inc. v. Limelight Networks, Inc.*, 797 F.3d 1020, 1022-1024 (Fed. Cir. 2015) (en banc).

### 3.8  INFRINGEMENT BY THE DOCTRINE OF EQUIVALENTS

If you decide that Sprint's method of providing LTE data services does not literally infringe claim 1 or 2, you must then decide whether it is more probable than not that this method infringes these claims under what is called the "doctrine of equivalents."

**[[TC Tech's Proposal:**

Under the doctrine of equivalents, Sprint's method of providing LTE data services can infringe a claim of the '488 patent if it includes steps that are equivalent to those elements of the claim that are not literally performed by the accused method.

An equivalent of an element is a component or action that is insubstantially different from the claimed element. One way of showing that an element is insubstantially different is to show that it performs substantially the same function in substantially the same way, to achieve substantially the same result as would be achieved by the element that is not literally present in the accused method.

The element "having the same carrier frequency for each remote location" has been construed by the Court to mean "the same carrier frequency is used by each and every 'remote location' that transmits data to the 'central location.'" The Court construed "central location" to mean "the equipment at a physical location that performs the claimed functions of the 'central location.'" TC Tech alleges that the doctrine of equivalents applies to the "having the same carrier frequency for each remote location" element and the "central location" element.   Thus, even if you find that Sprint's LTE data services do not literally infringe these elements, you must still consider whether there is any infringement under the doctrine of equivalents.[13]

---

[13] **TC Tech's footnote:**  On December 14, 2018, Sprint first sought a construction of the "same carrier frequency" limitation.  D.I. 258.  That construction required "all remote locations communicating with a central location to use the same carrier frequency."  D.I. 258 at 22.  On January 9, 2019, TC Tech opposed Sprint's construction of the "same carrier frequency" limitation.  D.I. 293 at 21-24.  On April 15, 2019, the Court issued its construction of the "same

_____

carrier" limitation.  D.I. 354 at 13.  On April 26, 2019, the Court permitted TC Tech to supplement to address the new construction.  D.I. 398 Exhibit B, at 71:12-13 ("… I think it's entirely fair that plaintiff had to supplement his report …").  Mr. Bates' April 25, 2019 Supplemental Expert Report and June 21, 2019 Supplemental Reply Report included arguments that Sprint's LTE Network infringes both claims of the '488 patent both literally and under the doctrine of equivalents under the Court's construction that "having the same carrier frequency for each remote location" means "the same carrier frequency is used by each and every 'remote location' that transmits data to the 'central location.'"  D.I. 398, Exs. A, C.  His reports provided opinions under the doctrine of equivalents opinions based on the "same carrier frequency," as well as the "central location" elements which both appeared in the court's new construction.  D.I. 398, Exs. A at ¶¶ 46-51, C at ¶¶ 27-30.

There is no dispute that both parties' experts are allowed to say they have considered the court's new claim construction of "central location" and provide their previously disclosed opinions in light of the new construction.  TC Tech disputes Sprint's assertion that TC Tech's expert never presented a theory of infringement under the doctrine of equivalents for the "central location" limitation.  In his opening supplemental report, TC Tech's expert provided opinions that "Even if all of the remotes in a sector were considered to be transmitting to the same 'central location,' as I understand Sprint intends to argue, Sprint's LTE base stations would still infringe under the doctrine of equivalents." D.I. 398 Ex. C at ¶ 27. He explained his analysis under the insubstantial differences test: "Even if the receiving equipment for all three carriers within a single sector was considered to be single central location, that is insubstantially different from transmitting to three separate central locations because all of the hardware, software, and associated computer resources needed to perform the claimed steps is separate for each of the three carriers within a single remote."  D.I. 398 Ex. C at ¶ 28. In his reply supplemental report, he explained that "Even if all of the remote locations in a sector were considered to be transmitting to the same 'central location,' as I understand Sprint intends to argue, Sprint's LTE base stations would still infringe under the doctrine of equivalents."  D.I. 398 Ex. A at ¶ 46.  He explained his analysis under the function, way, result test: "Applying the function, way, result test also demonstrates infringement under the doctrine of equivalence. The function of the same carrier frequency limitation is not substantially changed by the presence of *additional* software running on an eNodeB for additional carriers… The fact that Sprint performs steps apart from what is required by the claims, which only require that the method include ('comprising') the specified steps, does not result in a difference in the 'way' the claimed function is performed… As I explained above, this ignores the relevant claims language which when considered demonstrates that Sprint's method produces substantially the same result (enabling multiple remote locations to share a transmission channel to a central location in a way that alleviates channel impairments)." D.I. 398 Ex. A at ¶¶ 48-50.  He also provided his opinion that doctrine of equivalents was met because "As I explained above, even if under Mr. Proctor's analysis, this constitutes 1 instead of 9 separate central locations, an eNodeB is equivalent to 9 central locations with 9 separate sets of remote locations each assigned to 1 of 9 cells which receives, demodulates and transforms the incoming signals 9 times following the required steps of the claimed method."  D.I. 398 Ex. A at ¶ 51.

On July 15, 2019, Sprint moved to strike testimony from Mr. Bates' supplemental expert reports, including all of his theories under the doctrine of equivalents. D.I. 397 at 3. On October

<hr />

18, 2019, the Court denied Sprint's motion to strike.  D.I. 437 at 3.  TC Tech should be allowed an instruction which addresses both terms its expert provided doctrine of equivalence opinions on in the supplemental expert reports.    Sprint's assertion that doctrine of equivalents with respect to the "central location" limitation was resolved on the November 21, 2019 telephonic conference call with the Court is wrong.  That hearing addressed only a 1-page supplemental report submitted by TC Tech solely for the purpose of confirming that TC Tech's expert opinions hadn't changed in view of the Court's new construction of "central location."  The need to serve that supplemental report is now moot, as the parties' have now agreed that their experts will be allowed to say that they have considered the court's new claim construction of "central location" and provide their previously disclosed opinions in light of the new construction.    Moreover, paragraph 3 of that 1-page supplemental report, which the Court rejected as being conclusory (D.I. 464, Tr. of Nov. 21, 2019 Telephonic Conference (transcript not available until Dec. 12, 2019) at 7:18-8:5) only referenced a portion of a single paragraph from TC Tech's expert's supplemental reply report relating to the doctrine of equivalents that the Court has already allowed, and which contains many paragraphs on how Sprint satisfies doctrine of equivalents for both "same carrier" and "central location."  D.I. 398, Exs. A at ¶¶ 46-51, C at ¶¶ 27-30.  The Court did <u>not</u> hold that <u>all</u> of the doctrine of equivalents opinions it had previously allowed in Mr. Bates' supplemental reports were conclusory.  Rather, the Court explained that referencing this particular portion of paragraph 51 from Mr. Bates' supplemental reply report was too conclusory on its own to allow for a new report.

**Sprint's response:**  Sprint objects to TC Tech raising the issue of, and presenting any evidence regarding, the doctrine of equivalents with respect to the "central location" limitation, and therefore also objects to the inclusion of the "central location" in this instruction.  This issue was raised—and resolved—on the November 21, 2019 telephonic conference call with the Court.  (*See* D.I. 462, Sprint's Ltr. to the Court; D.I. 464, Tr. of Nov. 21, 2019 Telephonic Conference (transcript not available until Dec. 12, 2019).)  As explained in Sprint's November 21 letter, as well as the previously filed version of the parties' proposed final jury instructions (D.I. 461, Ex. B), Mr. Bates has <u>never</u> presented a theory of infringement under the doctrine of equivalents for the "central location" limitation. (D.I. 462 at 1-2; D.I. 461, Ex. B, at 33-34, n 13.)

There is no dispute that Mr. Bates's original report did not present any doctrine of equivalents theories with respect to this limitation.  Further, Mr. Bates's April and June supplemental reports only expressed doctrine of equivalents theories with respect to the "said carrier signal having the same carrier frequency for each remote location" limitation.  *See, e.g.*, Apr. 25, 2019 Supplemental Expert Report of Mr. Bates, D.I. 398 Ex. C, at ¶¶ 7, 27-30; June 21, 2019 Supplemental Reply Expert Report of Mr. Bates, D.I. 398 Ex. A, at ¶¶ 8, 46-51.

On November 20, 2019, TC Tech attempted to serve an additional supplemental expert report by Mr. Bates, which presented—for the first time—a doctrine of equivalents argument regarding the "central location" limitation.  (*See* D.I. 462 at 1-2.)  However, this report presented no analysis or testimony regarding the doctrine of equivalents with respect to the "central location" limitation. (*Id.*)  Accordingly, the Court found that this new doctrine of equivalents theory was wholly conclusory, as were the portions of the previous reports by Mr. Bates that it relied upon for support. (D.I. 464, Tr. of Nov. 21, 2019 Telephonic Conference (transcript not available until Dec. 12, 2019).)  The Court therefore excluded this new report, and the theories therein—including Mr. Bates's new doctrine of equivalents theory regarding the "central location." (*Id.*)

Further, as explained in Sprint's November 21 letter, if the Court were to allow Mr. Bates's new doctrine of equivalents opinion, it would necessitate postponing trial to avoid extreme prejudice to Sprint, as Sprint would need discovery from various third party vendors to establish the

]]

**[[Sprint's Proposal:** A patent claim is infringed under the doctrine of equivalents only if there is an equivalent step in Sprint's method of providing LTE data services for each step of the patent claim that is not literally present in Sprint's method. In other words, TC Tech must prove that it is more likely than not that Sprint's method of providing LTE data services contains the equivalent of each element of the claimed invention that is not literally present in Sprint's method.

In this case, TC Tech has only alleged that the doctrine of equivalents applies to the following cliam requiremet: "said carrier signal having the same carrier frequency for each remote location." [14] This requirement is present in both claims 1 and 2. Thus, in making your decision under the doctrine of equivalents, you must look at this element of the asserted claims— specifically, the requirement that "said carrier signal ha[s] the same carrier frequency for each remote location" transmitting to a central location—and decide whether Sprint's method of providing LTE data services has an equivalent step, if you find that this element is not literally present in Sprint's method. All of the other claim elements must be literally present in Sprint's method.

You may find that a step of Sprint's method is equivalent to this claim requirement, if it is not literally present, if a person having ordinary skill in the field of technology of the patent would have considered the differences between them to be "insubstantial" or would have found that the step of Sprint's method: (1) performs substantially the same function and (2) works in substantially

---

substantial differences between having one piece of equipment versus the nine "central locations" TC Tech alleges. (D.I. 462 at 1-2.)

[14] **Sprint's footnote:** *See, e.g.,* Apr. 25, 2019 Supplemental Expert Report of Mr. Bates, ¶¶ 7, 27-30; June 21, 2019 Supplemental Reply Expert Report of Mr. Bates, ¶¶ 8, 46-51. *See also* footnote 13, above.

the same way (3) to achieve substantially the same result as the requirement of the claims.  In order

to prove infringement by "equivalents," TC Tech must prove the equivalency of the step of Sprint's

method to the claims' requirement regarding that "said carrier signal ha[s] the same carrier

frequency for each remote location" transmitting to a central location by a preponderance of the

evidence.

However, application of the doctrine of equivalents is the exception, not the rule. Patent

claims must be clear enough so that the public has fair notice of what was patented. Notice permits

other parties to avoid actions which infringe the patent and to design around the patent. On the

other hand, the patent owner should not be deprived of the benefits of his patent by competitors

who appropriate the essence of an invention while barely avoiding the literal language of the patent

claims.[15] ]][16]


**AUTHORITY FOR AGREED PORTIONS:**
AIPLA's Model Patent Jury Instruction No. 3.7 (2018).


**AUTHORITY FOR TC TECH'S PROPOSAL:**
AIPLA's Model Patent Jury Instruction No. 3.7 (2018); *Bayer Healthcare LLC v. Baxalta Inc.*, No. 1:16-cv-01122-RGA (D. Del., Jan 31, 2019), D.I. 381(joint proposed final jury instructions) Instruction 4.2.3 at 32-33.

---

[15] **TC Tech's footnote:** TC Tech objects to this paragraph as a statement of policy and not law and as highly improper material for jury instructions.

[16] **TC Tech's footnote:** TC Tech notes that Sprint deviates from the language of AIPLA's Model Patent Jury Instruction No. 3.7 (2018), in changing the word "element" to "step" at various points in its proposal.

**Sprint's response**: Sprint disagrees with this assertion.  Sprint's language is based upon the jury instructions in the cases cited, which generally refer to an "accused product" and an "element" or a "part" thereof.  This case only concerns an accused method, thus it is appropriate to modify the lagnauge refer to an "accused method" and a "step" thereof.  These instructions also refer to a "requirement" instead of a "element."

**AUTHORITY FOR SPRINT'S PROPOSAL:**

AIPLA's Model Patent Jury Instruction, Pg. 4 (preliminary instruction regarding doctine of equivalents)(2018); AIPLA's Model Patent Jury Instruction No. 3.7 (2018); *Bio-Rad Labs., Inc. v. 10X Genomics, Inc*., No. 1:15-cv-00152-RGA (D. Del. Nov. 13, 2018), D.I. 470 (final jury instructions), Instruction 3.10 at 16; *Bayer Healthcare LLC v. Baxalta Inc.*, No. 1:16-cv-01122-RGA (D. Del., Jan 31, 2019), D.I. 381 (joint proposed final jury instructions) Instruction 4.2.3 at 32-33 (listing the particular claim element for which an equivalents claim was asserted); *Warner-Jenkinson Co. v. Hilton Davis Chem. Co*., 520 U.S. 17, 29 (1997) ("the doctrine of equivalents must be applied to individual elements of the claim, not to the invention as a whole").

Authority for final paragraph: *London v. Carson Pirie Scott & Co*., 946 F.2d 1534, 1538 (Fed.Cir.1991)("Application of the doctrine of equivalents is the exception, however, not the rule,. for if the public comes to believe (or fear) that the language of patent claims can never be relied on, and that the doctrine of equivalents is simply the second prong of every infringement charge, regularly available to extend protection beyond the scope of the claims, then claims will cease to serve their intended purpose."); *Int'l Visual Corp. v. Crown Metal Mfg. C.*, 991 F.2d 768, 774 (Fed. Cir. 1993)(same); *Eli Lilly and Co. v. Hospira*, 933 F.3d 1320, 1330 (Fed. Cir. 2019)(same); *Warner-Jenkinson Co., Inc. v. Hilton Davis Chem. Co.,* 520 U.S. 17, 29 (1997)("There can be no denying that the doctrine of equivalents, when applied broadly, conflicts with the definitional and public-notice functions of the statutory claiming requirement"); *K-2 Corp. v. Salomon S.A.*, 191 F.3d. 1356, 1366 (Fed.Cir. 1999).

## 4.   **INVALIDITY**

### 4.1  INVALIDITY GENERALLY

In this case, Sprint contends that claims 1 and 2 of the '488 patent are anticipated and, therefore, invalid. Sprint also contends that claims 1 and 2 of the '488 patent are obvious in view of the prior art.

Sprint further contends that claim 2 of the '488 patent is invalid for lack of adequate written description, **[[TC Tech's Proposal**: and that claim 2 of the '488 patent is invalid for failure to enable the full scope of the invention.**]] [[Sprint's Proposal**: that claim 2 of the '488 patent is invalid for failure to enable the full scope of the invention, and that claims 1 and 2 are invalid as indefinite.**]]**[17]

In making your determination, you must consider each of the patent claims and Sprint's contentions separately and individually.

**AUTHORITY**:      *Bio-Rad Labs., Inc. v. 10X Genomics, Inc.*, No. 1:15-cv-152, (D. Del. Nov. 13, 2018) D.I. 470 (final jury instructions), Instruction 4 at 17; Federal Circuit Bar Association Model Patent Jury Instructions at § 4.1 (July 2016).

---

[17] Sprint understands that the Court ruled that the asserted claims are not indefinite as a matter of law and thus will not allow this issue to be presented to the jury.  (*See* D.I. 464, Tr. of Nov. 21, 2019 Telephonic Conference (transcript not available until Dec. 12, 2019).)  Sprint presents this indefiniteness instruction to preserve its rights on appeal.

**[[TC Tech's Proposal:**

## 4.2  PERSPECTIVE OF ONE OF ORDINARY SKILL IN THE ART

The question of invalidity of a patent claim is determined from the perspective of a person of ordinary skill in the art in the field of the invention as of the time of the invention.

In deciding what the level of ordinary skill is, you should consider all the evidence introduced at trial, including but not limited to:

      1.      The levels of education and experience of persons working in the field;

      2.      The types of problems encountered in the field; and

      3.      The sophistication of the technology.

You should not consider what is known today or what was learned from the teachings of the '488 patent. You must put yourself in the place of a person of ordinary skill in the art as of September 28, 1995.**]]**

**[[Sprint's Proposal:**

## 4.3  PERSON OF ORDINARY SKILL IN THE ART

The question of invalidity of a patent claim is determined from the perspective of a person of ordinary skill in the art in the field of the invention at the time of the invention date.

You must determine the level of ordinary skill in the field of the invention. In deciding what the level of ordinary skill is you should consider all the evidence introduced at trial, including but not limited to:

      1.      The levels of education and experience of the inventors and other persons actively working in the field;

      2.      The types of problems encountered in the field;

3.      Prior art solutions to those problems;

4.      Rapidity with which innovations are made; and

5.      The sophistication of the technology.**]]**

**AUTHORITY FOR TC TECH'S PROPOSAL:**
            N.D. Cal. Model Patent Jury Instructions at § 4.1b, 4.3b.

**AUTHORITY FOR SPRINT'S PROPOSAL:**
            *Bio-Rad Labs., Inc. v. 10X Genomics, Inc*., No. 1:15-cv-00152 (D. Del.
            Nov. 13, 2018), D.I. 470 (final jury instructions), Instruction 4.1 at 18;
            The Federal Circuit Bar Association Model Patent Jury Instructions at
            § 4.3c(i) (July 2016).

### 4.3  PRIOR ART

Under the patent laws, a patent is valid only if the invention claimed in the patent is new and not obvious in light of what came before. That which came before is referred to as "prior art."

Prior art may include items that were publicly known or that had been used, or documents such as publications or patents, that disclose the claimed invention or elements of the claimed invention. These items or documents are called "references." To be prior art, a reference must have been made, known, used, published, or patented before TC Tech's date of invention. It is Sprint's burden to prove, by clear and convincing evidence, that any reference is prior art.

The parties agree that the following items are prior art to the '488 patent:

**[[TC Tech's Proposal**:

1.      Cioffi '651 – U.S. Patent No. 5,625,651, issued from an application filed June 2, 1994 to John M. Cioffi;

2.      The Cioffi Invention – A prior invention defined by the Cioffi '651 and reduced to practice by the filing of the patent application that issued as Cioffi '651; [18, 19]

3.      The NCTA Paper – a published paper titled "An Efficient Digital Modulation Scheme for Multimedia Transmission on the Cable Television Network", which names Krista S. Jacobsen and John M. Cioffi as authors, and which was published in 1994; and

The parties disagree as to whether the Alleged ICC Paper is prior art to the '488 patent. The parties agree that the Alleged ICC Paper is a document titled "High-performance Multimedia

---

[18] **Sprint's footnote:** Sprint objects to this characterization of its 102(g) defense.

[19] **TC Tech's footnote**: For the reasons articulated in TC Tech's summary judgment motion, TC Tech does not concede that a prior art prior invention pursuant to Section 102(g) may be reduced to practice by filing a patent application.  Accordingly, TC Tech expressly reserves its rights with respect to this issue.

Transmission on the Cable Television Network", which names Krista S. Jacobsen and John M. Cioffi as authors.  However, the parties disagree as to whether there is clear and convincing evidence that the Alleged ICC Paper was published before TC Tech's date of invention (September 28, 1995) so as to comprise prior art.]]

[[**Sprint's Proposal**:

1.      The "Cioffi '651 Patent" – U.S. Patent No. 5,625,651, which issued from an application filed June 2, 1994, and lists John M. Cioffi as the inventor and Amati Communications, Inc. as the assignee;

2.      The "NCTA Paper" – a paper titled "An Efficient Digital Modulation Scheme for Multimedia Transmission on the Cable Television Network", which names Krista S. Jacobsen and John M. Cioffi as authors, and was published in 1994; and

3.      The "Amati System" – an invention that was conceived prior to the claimed invention, and whose inventor(s) worked diligently to reduce it to practice, and reduced it to practice.  The inventor(s) did not abandon, suppress, or conceal the invention.[20]

The parties have not come to an agreement as to whether the following item is prior art to the '488 patent:

---

[20] **TC Tech's footnote**: TC Tech objects to this description of the "Amati System" (which TC Tech believes is more appropriately termed the "Cioffi Invention").  Sprint's proposed description introduces issues that are not disputed (*i.e.*, date of conception, diligence, abandonment, suppression, and concealment), provides no guidance for the jury as to the bounds of the Cioffi Invention, and would permit the jury to consider references and testimony beyond the scope of Sprint's argument.

As discussed further in footnote 22, TC Tech believes that any explanation of the Cioffi Invention should be confined to the disclosures of Cioffi '651.

**Sprint's response:** *see* footnote 22.

43

4.      The "ICC Paper" – a published paper entitled "High-performance Multimedia Transmission on the Cable Television Network", which names Krista S. Jacobsen and John M. Cioffi as author.

Sprint can prove this publication is prior art by showing, by clear and convincing evidence, that it was published prior to TC Tech's date of invention. **]]**


**AUTHORITY FOR AGREED AND CONTESTED PORTIONS:**
> *Bio-Rad Labs., Inc. v. 10X Genomics, Inc.,* No. 1:15-cv-152, D.I. 470 (final jury instructions) Instruction 4.2 at 19 (D. Del. Nov. 13, 2018); *E.I. Du Pont De Nemours & Co. v. Unifrax I LLC,* No. 1:14-cv-01250-RGA (D. Del. May 15, 2017), D.I. 325 (final jury instructions) Instruction 5.1 at 21; The Federal Circuit Bar Association Model Patent Jury Instructions at § 4.3a-1.


**ADDITIONAL AUTHORITY FOR TC TECH'S PROPOSAL:**
> *E.I. Du Pont De Nemours & Co. v. Unifrax I LLC,* No. 1:14-cv-01250-RGA (D. Del. May 15, 2017), D.I. 325 (final jury instructions) Instruction 5.1 at 21;


**ADDITIONAL AUTHORITY FOR SPRINT'S PROPOSAL:**
> 35 U.S.C. § 102 (a, g).

## 4.4  ANTICIPATION

Sprint contends that claims 1 and 2 of the '488 patent are invalid for anticipation. In order for a patent to be valid, the invention must be "new." In general, inventions are new when they have not been made, used, or disclosed before.

**[[TC Tech's Proposal**:  To prove anticipation, Sprint must prove by clear and convincing evidence that the claimed invention was not new. Anticipation must be determined on a claim-by-claim basis.

In this case, Sprint contends that the invention of claims 1 and 2 of the '488 patent are anticipated by: (a) Cioffi '651 and (b) the Cioffi Invention.[21]  TC Tech disagrees that either claim is anticipated.  For purposes of anticipation, you should only consider the disclosures of the Cioffi '651 because that document constitutes the Cioffi '651 patent and is also the reduction to practice of the Cioffi Invention.]][22]

---

[21] **Sprint's footnote**: Sprint objects to this characterization of its 102(g) theory.

[22] **TC Tech's footnote**: Sprint's instruction—and its rejection of TC Tech's instruction—reflects its intention to disobey the Court's directive regarding the permissible scope of Sprint's 102(g) defense.  At the April 26, 2019 Pretrial Conference, the Court observed that 102(g) anticipation requires that the claimed invention be reduced to practice before the priority date of the '488 patent. (Tr. at 26:5-17; *see also  TC Tech. LLC v. Sprint Corp.*, 379 F. Supp. 3d 305, 318 (D. Del. 2019) (Andrews, J.) (citing *Solvay S.A. v. Honeywell Int'l Inc.*, 742 F.3d 998, 1000 (Fed. Cir. 2014)). The alleged reduction to practice in this case is Cioffi '651.  Consequently, as the Court also noted, Sprint's 102(g) defense is duplicative of its defense that Cioffi '651 anticipates.  (Tr. at 26:18-24). Sprint's 102(g) defense stands or falls with its ability to prove that Cioffi '651 alone discloses all of the elements of the '488 patent's claims.  (Tr. at 28:13-29:6; 30:10-17; 31:6-11; 33:6-10).  Sprint does not require any other 102(g)-related evidence with respect to conception, diligence or anything else, because the only disputed issue is whether Cioffi '651 reduced to practice the claimed invention.

Nonetheless, Sprint's counsel stated at the hearing that Sprint wants "to be able to use the NCTA paper, the Cioffi '651, and the ICC paper, those first three things together in support of a 102(g) event…[a]nd that would be our ask on -- our most narrow ask on 102(g)."  (Tr. at 34:8-15; 36:1-3.)  That, he said, would allow Sprint to tell a "prior invention story" about the diligence between the alleged publications of the NCTA and ICC papers and the filing of the Cioffi '651 patent. (Tr. at 35:5-5-18).

The Court allowed Sprint to use those three references as support for its 102(g) defense.  But **only** those three references—no other evidence would be permitted (Tr. at 36:4-13; 37:5-10; 37:21-23.)

[[**Sprint's Proposal:** In this case, Sprint contends that claims 1 and 2 of the '488 patent

are anticipated by:

---

The Court further noted that it would give a jury instruction that the ICC and NCTA papers do not count as reductions to practice, and that "the only thing that counts is Cioffi." (Tr. at 37:16-17) TC Tech's proposed instruction is the instruction the Court indicated it would give.

Sprint's proposed instruction ignores the Court's directive.  It does not describe what constitutes the so-called "Amati system," and does not in any way limit the evidence Sprint can rely on in support of its 102(g) defense.  And Sprint does not include the instruction that the only thing that matters for purposes of 102(g) anticipation is disclosure in Cioffi '651.

Notably, prior to the evening of November 18, 2019, Sprint had never stated that it intended to disregard the Court's directive.  Letter from D. Morehan to M. Preston, dated July 12, 2019 ("Sprint intends to rely on the Cioffi '651 patent to show constructive reduction to practice, and intends to rely on the NCTA paper and the ICC paper to show conception and diligence in reduction to practice."); Amended Proposed Joint Pretrial Order (D.I. 419) ¶ 185 (Sprint "will not rely on Amati references outside of the Cioffi '651 patent, the ICC Paper, and the NCTA Paper for purposes of proving anticipation under 102(g)").  Its current instruction contradicts its own prior representations as well.

**Sprint's response:** Sprint objects to this instruction as confusing and misleading with respect to its 102(g) theory.  Further, TC Tech's footnote contains a number of inaccuracies regarding this theory.  As stated at the April 26, 2019 Pretrial Conference, Sprint intends to rely upon the testimony of Dr. Jacobsen and documents other than the Cioffi '651 patent (*i.e.*, the NCTA and ICC Papers) as evidence of conception and diligence in reduction to practice without abandonment, suppression, or concealment.  Pretrial Conference (Apr. 26, 2019) Tr. at 34:8-36:17, 32:10-33:5.  Sprint intends to rely on the Cioffi '651 patent as evidence of reduction to practice.  *Id.*

Unlike invalidity theories under 35 U.S.C. § 102(a), (b), and (e), which are generally limited to the contents of the documents asserted as prior art, theories under 35 U.S.C. § 102(g) allow for inventor testimony with regards to was the invention was, and how it was conceived and diligently reduced to practice.  Accordingly, the testimony of Dr. Jacobsen is relevant evidence with respect to the Amati Invention. *See, e.g.,* Pretrial Conference (Apr. 26, 2019) Tr. at 34:3-7 (Judge Andrews)("I think I understand why from a point of view of establishing Dr. Jacobsen's authority, you want to have her participate in this invention. I think that's legitimate.")  As explained at the April 26, 2019 Pretrial Conference, the NCTA and ICC Papers, as well as the Cioffi '651 patent, <u>corroborate</u> her testimony. *See, e.g., id.* at 24:20-25:9, 25:20-26:4, 26:10-28:8, 29:7-30:7, 31:12-33:5. Yet TC Tech seeks to exclude the jury from considering her testimony, asserting that it "should <u>only</u> consider the disclosures of the Cioffi '651" patent when considering anticipation under 35 U.S.C. § 102(g).  This is improper.

Further, contrary to what TC Tech implies, the Court said that, with respect to reduction to practice (only), the Cioffi '651 patent is "the only thing that counts." *Id.* at 37:5-17.  The Court did <u>not</u> state that Sprint's entire 102(g) presentation and theory would be limited to the '651 patent.  Instead, it stated that Sprint should not "say that the ICC or the NCTA paper is a reduction to practice"—which Sprint does not intend to do—but that these documents "might be relevant to the not abandon, suppress, or concealed kind of aspect of things. And then Dr. Jacobsen will say that they did whatever they did whenever they did it. That seems like a reasonable offer." *Id.* at 36:7-15.

1.      The "Cioffi '651 Patent," and

2.      The "Amati System."

Both parties agree that these references constitute prior art.  To prove anticipation, Sprint must prove by clear and convincing evidence that the claimed invention was not new, based on the Cioffi '651 Patent  or the Amati System.  Anticipation must be determined on a claim-by-claim basis.]]

For the claim to be invalid because it is not new, each and every element in the claim must be present in a single prior art reference or prior invention, and arranged or combined in the same way as recited in the claim. In determining whether every one of the elements of the claimed invention is found in a particular prior art reference or prior invention, you should take into account what a person of ordinary skill in the art would have understood from his or her review of it. If you find that an asserted claim was anticipated by a single prior art reference or prior invention, then that claim is invalid.

In determining whether a single prior art reference or prior invention anticipates a patent claim, you should take into consideration not only what is expressly disclosed in the particular prior art reference or prior invention but also what is inherently present or disclosed in that prior art or inherently results from its practice. A prior art reference or prior invention inherently anticipates a patent claim if the missing element or feature would necessarily result from what that reference or invention teaches to a person of ordinary skill in the art. A party claiming inherent anticipation must prove by clear and convincing evidence that the allegedly inherent element was necessarily present. Evidence outside of the prior art reference or prior invention itself may be used to show that elements that are not expressly disclosed in the reference or invention are inherent in it. The fact that it was likely is not sufficient. It is not required, however, that a person

of ordinary skill actually recognized or appreciated the inherent disclosure at the time the prior art reference was first known or used. Thus, the prior use of the patented invention that was unrecognized and unappreciated can still be an invalidating anticipating reference, provided the allegedly inherent feature was necessarily and inevitably present in the reference.

[[**TC Tech's Proposal**: If an element of a claim is not disclosed expressly or inherently by a prior art reference or prior invention, then it is not anticipated. Anticipation does not permit a missing element to be supplied by the knowledge of a person skilled in the art, or by looking to another reference.]][23]

---

[23] **Sprint's footnote**: Sprint objects to this proposal as unnecessary and confusing. Sprint's proposed obviousness instruction, Section 4.5, makes it clear that while anticipation only allows the consideration of a single piece of art, obviousness allows for the consideration of more than one item of prior art. Further, is it black letter law that a reference is anticipatory if "it discloses the claimed invention 'such that a skilled artisan could take its teachings *in combination with his own knowledge of the particular art and be in possession of the invention.*'" *In re Graves*, 69 F.3d 1147, 1152 (Fed. Cir. 1995)(emphasis in original, quoting *Application of LeGrice*, 301 F.2d 929, 936 (1962), and citing *In re Donohue*, 766 F.2d 531, 533 (Fed. Cir. 1985) (affirming §102(b) rejection)); *see also In re Paulsen*, 30 F.3d 1475, 1480–81, (Fed. Cir. 1994) ("a prior art reference must be considered together with the knowledge of one of ordinary skill in the pertinent art" at the time the application was filed).

**TC Tech's response**: TC Tech includes this proposal because Sprint's expert on validity has opined that asserted prior art anticipates claims of the '488 patent because, for example, claim steps were "well known in the art as of the priority date" (Jacobsen Opening Rep. ¶ 378), relying on external references (not asserted prior art) to demonstrate what was allegedly well known. *See, e.g., id.* (citing *id.* ¶¶ 158-59). This does not constitute anticipation. *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1335 (Fed. Cir. 2002) ("anticipation does not permit an additional reference to supply a missing claim limitation."); *Structural Rubber Prod. Co. v. Park Rubber Co.*, 749 F.2d 707, 716 (Fed. Cir. 1984) (rejecting argument that "missing elements may be supplied by the knowledge of one skilled in the art or the disclosure of another reference"); *W.L. Gore & Associates, Inc. v. C.R. Bard, Inc.*, 146 F. Supp. 3d 595, 609-10 (D. Del. 2015) (Stark, J.) (rejecting reference to knowledge of POSITA for anticipation); *Forest Labs., Inc. v. Ivax Pharms.*, Inc., 438 F. Supp. 2d 479, 485 (D. Del. 2006) (Farnan, J.) (same). The jury should not be confused into believing that such testimony is relevant to anticipation.

Sprint's citation to *In re Graves* is of no assistance, as subsequent decisions by the Federal Circuit and the District of Delaware have made clear that missing elements cannot be filled by the knowledge of a person of skill in the art, or by reference to other documents. *See, e.g., Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1334-35 (Fed. Cir. 2002); *W.L. Gore & Associates, Inc. v. C.R. Bard, Inc.*, 146 F. Supp. 3d 595, 609-10 (D. Del. 2015) (Stark, J.). Indeed, the cases cited in *In re Graves*—as well as the other case Sprint cites (*In re Paulsen*)—relate to the requirement that prior art be enabling, rather than a standard for judging anticipation. *In re Paulsen*, 30 F.3d 1475, 1480-81 (Fed. Cir. 1994) (addressing argument that prior art "does not

**AUTHORITY FOR AGREED PORTIONS:**

*E.I. Du Pont De Nemours & Co. v. Unifrax I LLC*, No. 1:14-cv-01250-RGA (D. Del. May 15, 2017), D.I. 325 (final jury instructions), Instruction 5.4 at 25-26; N.D. Cal. Model Patent Jury Instructions at § 4.3a-1; *Bio-Rad Labs., Inc. v. 10X Genomics, Inc.*, No. 1:15-cv-00152 (D. Del. Nov. 13, 2018), D.I. 470 (final jury instructions), Instruction 4.3 at 20-21; The Federal Circuit Bar Association Model Patent Jury Instructions at § 4.3b-1 ("Anticipation") at 46-47 (July 2016).

**AUTHORITY FOR TC TECH'S PROPOSALS:**

*E.I. Du Pont De Nemours & Co. v. Unifrax I LLC*, No. 1:14-cv-01250-RGA (D. Del. May 15, 2017), D.I. 325 (final jury instructions), Instruction 5.4 at 25-26; 35 U.S.C. § 102(g) (1994) (prior art prior inventions require a "reduction to practice of the invention"); *Solvay S.A. v. Honeywell Int'l, Inc.*, 622 F.3d 1367, 1376 (Fed. Cir. 2010) ("constructive reduction to practice occurs when a patent application on the claimed invention is filed"); Pretrial Conference (Apr. 26, 2019) at 37:5-17 (offering to instruct the jury that "the only thing that counts is Cioffi"); *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1335 (Fed. Cir. 2002) ("anticipation does not permit an additional reference to supply a missing claim limitation."); *Structural Rubber Prod. Co. v. Park Rubber Co.*, 749 F.2d 707, 716 (Fed. Cir. 1984) (rejecting argument that "missing elements may be supplied by the knowledge of one skilled in the art or the disclosure of another reference"); *W.L. Gore & Associates, Inc. v. C.R. Bard, Inc.*, 146 F.Supp.3d 595, 609-10 (D. Del. 2015) (rejecting reference to knowledge of POSITA for anticipation); *Forest Labs., Inc. v. Ivax Pharms.*, Inc., 438 F. Supp. 2d 479, 485 (D. Del. 2006) (same).

**AUTHORITY FOR SPRINT'S PROPOSALS:**

*Bio-Rad Labs., Inc. v. 10X Genomics, Inc.*, No. 1:15-cv-00152 (D. Del. Nov. 13, 2018), D.I. 470 (final jury instructions), Instruction 4.3 at 20-21; *E.I. Du Pont De Nemours & Co. v. Unifrax I LLC*, No. 1:14-cv-01250-RGA (D. Del. May 15, 2017), D.I. 325 (final jury instructions), Instruction 5.4 at 25-26.

*In re Graves*, 69 F.3d 1147, 1152 (Fed. Cir. 1995)(a reference is anticipatory if "it discloses the claimed invention such that a skilled artisan could take its teachings in combination with his own

---

anticipate . . . because it is not enabling"); *In re Donohue*, 766 F.2d 531, 533 (Fed. Cir. 1985) (finding that "disclosure will not suffice as prior art if it was not enabling"); *Application of LeGrice*, 301 F.2d 929, 936 (C.C.P.A. 1962) (finding that "the published information therein is not sufficient to enable anyone of ordinary skill in the art . . . to practice the invention").

knowledge of the particular art and be in possession of the invention.")(internal quotations omitted, citing *Application of LeGrice*, 301 F.2d 929, 936 (1962) and *In re Donohue*, 766 F.2d 531, 533 (Fed.Cir.1985)); *In re Paulsen*, 30 F.3d 1475, 1480–81 (Fed. Cir. 1994) ("a prior art reference must be considered together with the knowledge of one of ordinary skill in the pertinent art" at the time the application was filed).

## 4.5  OBVIOUSNESS

Sprint contends that claims 1 and 2 of the '488 patent are invalid for obviousness.

Even though an invention may not have been identically disclosed or described before it was made by an inventor, in order to be patentable, the invention must also not have been obvious to a person of ordinary skill in the field at the time the invention was made.

**[[TC Tech's Proposal**: In this case, Sprint contends that the invention of claims 1 and 2 of the '488 patent are obvious in view of: (a) Cioffi '651 alone; (b) a combination of the Alleged ICC Paper and Cioffi '651; (c) a combination of the NCTA Paper and Cioffi '651; and (d) a combination of the Alleged ICC Paper, the NCTA Paper, and Cioffi '651.

Sprint may establish that a patent claim is invalid by showing, by clear and convincing evidence, that the claimed invention would have been obvious to persons having ordinary skill in the art at the time the invention was made.

In deciding obviousness**,** you must avoid using hindsight; that is, you should not consider what is known today or what was learned from the teachings of the '488 patent. You should not use the patent as a road map for selecting and combining items of prior art. You must put yourself in the place of a person of ordinary skill in the art at the time the invention was made.

In determining whether a claimed invention is obvious, you must consider (1) the scope and content of the prior art, (2) the level of ordinary skill in the pertinent art, (3) the differences between the claimed invention and the prior art. and (4) objective indicia of non-obviousness.

To determine the scope and content of the prior art, you must determine what prior art is reasonably pertinent to the particular problems the inventors faced. The person of ordinary skill in the art is presumed to be aware of all of the pertinent prior art.

You must also consider the differences, if any, between the prior art and the claimed inventions. Importantly, a claim is not proved obvious merely be demonstrating that each of the

elements was independently known in the prior art. Most, if not all, inventions rely on building blocks of prior art, and claimed discoveries almost of necessity will likely be combinations of what is already known. Therefore, you should consider whether a reason existed at the time of the invention that would have prompted a person of ordinary skill in the art in the relevant field to combine the known elements in the way the claimed invention does. The motivation to modify the prior art to arrive at the claimed invention need not be the same motivation that the inventor had.

Common sense and common knowledge have their proper place in the obviousness inquiry.  However, common sense or knowledge may be used to fill in a missing claim limitation only when explained with sufficient reasoning and evidentiary support, and when the limitation in question was unusually simple and the technology particularly straightforward.

In deciding the obviousness question, you may take into account such factors as:

1. Whether the claimed invention was merely the predictable result of using prior art elements according to their known functions;

2. Whether the claimed invention provides an obvious solution to a known problem in the relevant field;

3. Whether the prior art teaches or suggests the desirability of combining elements claimed in the invention; and

4. Whether the prior art teaches away from combining of elements, such as when there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions.

In making obviousness determinations, you should take into account any objective evidence, sometimes called "secondary considerations," that may have existed at the time of the

invention and afterwards that may shed light on the obviousness or not of the claimed invention. Examples of objective evidence of non-obviousness include, (1) the others having failed to conceive of the invention, (2) a long felt, but unmet, need, that was solved by the invention, (3) unexpected superior results from the invention, and (4) commercial success as a result of the merits of the claimed invention, rather than the result of design needs or market-pressure, advertising, or similar activities.

You should consider whether or not evidence of any of the above factors exists. Finding evidence of the above secondary considerations may suggest that the claim was not obvious. However, there must be a connection between the evidence showing any of these factors and the merits of the claimed inventions if this evidence is to be given weight by you in arriving at your conclusion on the obviousness issue.**]]**

**[[Sprint's Proposal:** Unlike anticipation, which allows consideration of only one item of prior art, obviousness may be proven by considering more than one item of prior art. In this case, Sprint contends that claims 1 and 2 of the '488 patent are obvious over prior art and the knowledge of a person of skill in the art.

Sprint must prove by clear and convincing evidence that the invention of claims 1 and 2 of the '488 patent would have been obvious to persons having ordinary skill in the art at the time the invention was made. The issue is not whether the claimed inventions would have been obvious to you as a layperson, or to a genius in the field of technology, but whether it would have been obvious to one of ordinary skill in the art at the time the invention was made.

In deciding obviousness**,** you must avoid using hindsight; that is, you should not consider what is known today or what was learned from the teachings of the '488 patent. You should not use

the patent as a road map for selecting and combining items of prior art. You must put yourself in the place of a person of ordinary skill in the art at the time the invention was made.

In determining whether a claimed invention is obvious, you must consider (1) the scope and content of the prior art, (2) the level of ordinary skill in the pertinent art, and (3) the differences between the claimed invention and the prior art.

To determine the scope and content of the prior art, you must determine what prior art is reasonably pertinent to the particular problems the inventors faced. The person of ordinary skill in the art is presumed to be aware of all of the pertinent prior art.

I have already instructed you on how you are to determine the level of ordinary skill in the art. Once you have made that determination, you are to apply it in your determination whether the asserted claims would have been obvious.

You must also consider the differences, if any, between the prior art and the claimed inventions. Importantly, a claim is not proved obvious merely be demonstrating that each of the elements was independently known in the prior art. Most, if not all, inventions rely on building blocks of prior art, and claimed discoveries almost of necessity will likely be combinations of what is already known. Therefore, you should consider whether a reason existed at the time of the invention that would have prompted a person of ordinary skill in the art in the relevant field to combine the known elements in the way the claimed invention does. The motivation to modify the prior art to arrive at the claimed invention need not be the same motivation that the inventor had.

In arriving at your decision on the issue of whether the claimed inventions of the asserted, you may take into account such factors as:

1. Whether the claimed invention was merely the predictable result of using prior art elements according to their known functions;

2. Whether the claimed invention provides an obvious solution to a known problem in the relevant field;

3. Whether the prior art teaches or suggests the desirability of combining elements claimed in the invention;

4. Whether the prior art teaches away from combining elements in the claimed invention, and

5. Whether it would have been obvious to try the combinations of elements, such as when there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions.

In arriving at your decision on the issue of whether the claimed inventions of the asserted patents would have been obvious to a person of ordinary skill in the art, you should take into account any objective evidence, sometimes called "secondary considerations," that may have existed at the time of the invention and afterwards that suggest that the claimed invention was obvious or not, such as:

1. whether others had tried and failed to make the invention,

2. whether the invention satisfied a long felt, but unmet, need, that was solved by the invention,

3. unexpected superior results from the invention,

4. whether the invention was commercially successful as a result of the merits of the claimed invention, rather than the result of design needs or market-pressure, advertising, or similar activities,

5.      whether others invented the invention at roughly the same time, and

6.      whether others sought or obtained rights to the patent from the patent holder.

Some of these factors weigh in favor of obviousness and others weigh against a finding of obviousness. For example, evidence that others invented the invention at roughly the same time can be evidence of obviousness. You should consider whether or not evidence of any of the above factors exists.

These factors should be considered along with all the other evidence in the case in determining whether the claimed invention would have been obvious. However, there must be a connection between the evidence showing any of these factors and the claimed invention if this evidence is to be given weight by you in arriving at your conclusion on the obviousness issue. For example, if commercial success is due to advertising, promotion, salesmanship or the like, or is due to features of the products other than those claimed in the patent, then any commercial success may have no relation to the issue of obviousness.]][24]

**AUTHORITY FOR TC TECH'S PROPOSAL:**

> *E.I. Du Pont De Nemours & Co. v. Unifrax I LLC*, No. 1:14-cv-01250-RGA (D. Del. May 15, 2017), ECF No. 325 (final jury instructions) at 27-29); N.D. Cal. Model Patent Jury Instructions at § 4.3b; *DSS Tech. Mgmt., Inc. v. Apple Inc.*, 885 F.3d 1367, 1374 (Fed. Cir. 2018) ("'[C]ommon sense and common knowledge have their proper place in the obviousness inquiry,' at least 'if explained with sufficient reasoning.' 'But,' we cautioned, 'there are at least three caveats to note in applying common sense in an obviousness analysis.' 'First, common sense is typically invoked to provide a known motivation to combine, not to supply a missing claim limitation.' Second, we have invoked common sense to fill in a missing limitation only when 'the limitation in question was unusually simple and the technology particularly straightforward.' 'Third, our cases repeatedly warn that references to

---

[24] **TC Tech's footnote:** TC Tech objects to Sprint's proposal insofar as it deviates from the Court's instructions given in prior cases, and injects impertinent issues into the instructions.

common sense—whether to supply a motivation to combine or a missing limitation—cannot be used as a wholesale substitute for reasoned analysis and evidentiary support, especially when dealing with a limitation missing from the prior art references specified.'").

**AUTHORITY FOR SPRINT'S PROPOSAL:**

*Bio-Rad Labs., Inc. v. 10X Genomics, Inc.*, No. 1:15-cv-00152 (D. Del. Nov. 13, 2018), D.I. 470 (final jury instructions), Instruction 4.4 at 22-25.

## 4.6  WRITTEN DESCRIPTION

Sprint contends that claim 2 of the '488 patent is invalid because the specification of the patent does not contain an adequate written description of the claimed invention.

To succeed in this defense, Sprint must show by clear and convincing evidence that the specifications fail to meet the law's requirements for written description of the claimed invention.

In deciding whether the specifications satisfy the written description requirement, you must consider the description from the viewpoint of a person having ordinary skill in the field of technology of the patent when the application was filed. The written description requirement is satisfied if a person having ordinary skill in the art at the date of invention would have recognized, from reading the patent specifications, that the inventor described the full scope of the invention.

The written description requirement may be satisfied by any combination of the words, structures, figures, diagrams, formulas, etc., contained in the patent specification. The specification is not required to expressly include what is well-known to a person of ordinary skill in the art at the date of invention. The level of required disclosure depends on a variety of factors, such as the existing knowledge in the particular field, the extent and content of the prior art, the maturity of the science or technology, and other considerations appropriate to the subject matter. Under the doctrine of inherent disclosure, when a specification describes an invention that has certain undisclosed yet inherent properties, those inherent properties may be relied upon for written description support. To be inherent, the feature that is alleged to have been inherent must necessarily have existed in the specification. The fact that the feature is likely to have existed is not sufficient. It is not required, however, that persons of ordinary skill recognize or appreciate the inherent disclosure at the time the application was filed on September 28, 1995. The written description requirement does not demand either examples or an actual reduction to practice.

**AUTHORITY**:        *Amgen Inc. v. Sanofi*, No. 1:14-cv-01317-RGA (D. Del. Feb 25, 2019), D.I. 812 (final jury instructions) at 13-14.

## 4.7  ENABLEMENT

Sprint contends that claim 2 of the '488 patent is invalid because the patent does not disclose sufficient information to enable one skilled in the field of the invention, at the time the application was filed, to make and use the full scope of the claimed invention. This requirement is known as the enablement requirement, and it is designed to prevent both inadequate disclosure of an invention and overbroad claiming that might otherwise attempt to cover more than was actually invented. The purpose of this requirement is to ensure that the public, in exchange for the patent rights given to the inventor, obtains from the inventor a sufficient disclosure of how to carry out the claimed invention. If a patent claim is not enabled, it is invalid. Each claim must be analyzed for compliance with the enablement requirement.

In considering whether a patent claim satisfies the enablement requirement, you must keep in mind that patents are written for persons of skill in the field of the invention. Thus, a patent need not expressly state information that skilled persons would be likely to know or could obtain. Sprint bears the burden of establishing lack of enablement by showing by clear and convincing evidence that a person skilled in the art, upon reading the patent document, would not be able to make the full scope of the claimed invention work without undue experimentation. The fact that some experimentation may be required for a skilled person to make or use the full scope of the claimed invention does not mean that a patent's written description fails to meet the enablement requirement. Factors you may consider in determining whether making the full scope of the claimed invention would require undue experimentation include:

1.      The quantity of experimentation necessary

2.      The amount of direction or guidance disclosed in the patent;

3.      The presence or absence of working examples in the patent;

4.       The nature of the invention;

5.       The state of the prior art;

6.       The relative skill of those in the field.

7.       The predictability of the field; and

8.       The breadth of the claims;

If you find that one or more of these claims did not comply with the enablement requirement, you must find each such claim invalid.**]]**

**AUTHORITY:**

*Bio-Rad Labs., Inc. v. 10X Genomics, Inc.*, No. 1:15-cv-00152 (D. Del. Nov. 13, 2018), D.I. 470 (final jury instructions), Instruction 4.5 at 26-27.

[[**Sprint's proposal:**

## 4.8  INDEFINITENESS

Sprint contends that the Sprint contends that the two asserted claims of the '488 Patent are invalid because they are indefinite.  In particular, Sprint contends that the term "central location"—which is present in both asserted claims of the '488 patent—renders the claims infinite because a person of skill in the art could not determine, with reasonable certainly, the scope of this term. Sprint bears the burden of establishing indefiniteness by clear and convincing evidence.**]]**

The patent laws have requirements for the way in which patent claims are written. Patent claims must be sufficiently clear that a person of ordinary skill in the field of the invention reading them is able to determine what the claims cover and what they do not cover. If a claim does not meet that requirement, then the claim is said to be indefinite and is invalid.

To prevail on its contention, Sprint must show that it is highly probable that a person of ordinary skill in the art would not understand what is and is not covered by the claims of the patents.   The amount of detail required for a claim to be definite depends on the particular invention, the prior art, and the written description contained in the patent. Absolute clarity is not necessary. Rather, a patent is invalid for indefiniteness if its claims, read in light of the specification  and prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention.

A claim is indefinite if its language might mean several different things and no informed and confident choice is available among the contending definitions. The patent and prosecution

history must disclose a single known approach or establish that, where multiple known approaches exist, a person having ordinary skill in the art would know which approach to select.]] [25]

**AUTHORITY FOR SPRINT'S PROPOSAL**:

> *Bio-Rad Labs., Inc. v. 10X Genomics, Inc*., No. 1:15-cv-00152 (D. Del. Nov. 13, 2018), D.I. 470 (final jury instructions), Instruction 4.6 at 28; *Bayer Healthcare LLC v. Baxalta Inc.*, No. 1:16-cv-01122-RGA (D. Del., Jan 31, 2019), D.I. 381 (joint proposed final jury instructions) Instruction 5.7 at 57; ; *Ateliers De La Haute-Garonne v. Broetje Automation-USA Inc,* 1:09-cv-00598-LPS (D. Del. Apr. 11, 2014), D.I. 415 (final jury instructions), Instruction 6.10 at 48.

---

[25] Sprint understands that the Court ruled that the asserted claims are not indefinite as a matter of law and thus will not allow this issue to be presented to the jury.  (*See* D.I. 464, Tr. of Nov. 21, 2019 Telephonic Conference (transcript not available until Dec. 12, 2019).)  Sprint presents this indefiniteness instruction to preserve its rights on appeal.

## 5.   DAMAGES

### 5.1 DAMAGES INTRODUCTION

I will instruct you about the measure of damages. By instructing you on damages, I am not suggesting which party should win on any issue. If you find that Sprint infringed any valid claim of the '488 patent, you must then determine the amount of money damages to be awarded to TC Tech to compensate it for the infringement, that is, for Sprint's use of the invention. **[[Sprint's Proposal:** On the other hand, if you find that each of the asserted patent claims is either invalid or is not infringed, then you should not consider damages in your deliberations.**]]**

The amount of those damages must be adequate to compensate TC Tech for the infringement. In this case, the amount adequate to compensate TC Tech is a reasonable royalty for the use made of the invention by Sprint. You should keep in mind that the damages you award are meant to compensate the patent holder and not to punish an infringer. **[Sprint's Proposal:** You also may not add anything to the amount of damages for interest. You must be careful to ensure that the damages award is no more or no less than the value of the patented invention.**]]**

In this case, TC Tech seeks a reasonable royalty. A reasonable royalty is defined as the money amount a patent holder and alleged infringer would have agreed upon as a fee for use of the invention before the infringement first began. I will give more detailed instructions regarding a reasonable royalty shortly. **[[TC Tech's Proposal:** Note, however, that TC Tech is entitled to recover no less than a reasonable royalty for each infringing use.**]]**  **[[Sprint's Proposal:** Note, however, that TC Tech is entitled to recover no more or less than a reasonable royalty for each infringing use.**]][[**[26]**]]** TC Tech has the burden to persuade you of the amount of its damages by a

---

[26] **Sprint's footnote:** Sprint objects to this instruction as unnecessary and potentially confusing because, consistent with the relief TC Tech has requested in this case, jurors are

preponderance of the evidence. You should award only those damages that TC Tech more likely than not suffered. While TC Tech is not required to prove its damages with mathematical precision, it must prove them with reasonable certainty. TC Tech is not entitled to damages that are remote or speculative.

**AUTHORITY:**     N.D. Cal. Model Patent Jury Instructions B.5.1 (citing 35 U.S.C. § 284; *Dow Chem. Co. v. Mee Indus., Inc.*, 341 F.3d 1370, 1381–82 (Fed. Cir. 2003); *Grain Processing Corp. v. American Maize-Prod. Co.*, 185 F.3d 1341, 1349 (Fed. Cir. 1999); *Maxwell v. J. Baker, Inc.*, 86 F.3d 1098, 1108–09 (Fed. Cir. 1996); *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1544–45 (Fed. Cir. 1995) (en banc); *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1340 (Fed. Cir. 2009); *Ericsson v. D-Link Sys., Inc.*, 773 F.3d 1201, 1230–32 (Fed. Cir. 2014)).

**AUTHORITY FOR TC TECH'S PROPOSAL:**

TC Tech requests the "reasonable royalty" paragraph based on the damages instruction this Court gave when Sprint was a plaintiff in *Sprint Commc'ns Co. L.P. v. Comcast Cable Commc'ns, LLC*, No. 1:12-cv-01013-RGA (D. Del. Feb. 5, 2015), D.I. 264 (final jury instructions) Instruction 4.1 at 21.

---

being instructed to give TC Tech a reasonable royalty, not more or less, if they reach damages. As proposed by TC Tech, this instruction incorrectly implies the jury can award more than a reasonable royalty for each infringing use. If this instruction is included at all, Sprint requests its proposal be used.

**TC Tech's response:** Sprint's proposed instructions about awarding damages that are "no more or less" than a reasonable royalty are contrary to black-letter patent law. The damages statute requires courts to award "damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use of the invention made by the infringer." 35 U.S.C. § 284 (emphasis added). By statute and under controlling precedent, a reasonable royalty is the floor, not the ceiling, for patent damages and Sprint's attempt to instruct the jury otherwise is legally erroneous. *Rite-Hite Corp. v. Kelley Co*., 56 F.3d 1538, 1544 (Fed. Cir. 1995) ("Section 284 further instructs that a damage award shall be 'in no event less than a reasonable royalty'; the purpose of this alternative is not to direct the form of compensation, but to set a floor below which damage awards may not fall. *Del Mar Avionics, Inc. v. Quinton Instrument Co*., 836 F.2d 1320, 1326, 5 USPQ2d 1255, 1260 (Fed. Cir. 1987). Thus, the language of the statute is expansive rather than limiting. It affirmatively states that damages must be adequate, while providing only a lower limit and no other limitation.")

Moreover, the Court gave this exact instruction when Sprint was a plaintiff seeking a royalty in *Sprint Communications Co. v. Comcast*, because it correctly reflects the right of the victim of infringement to recover a reasonable royalty for each infringing use. *See* 35 U.S.C. § 284. Sprint can hardly claim unfairness with this instruction now that it is a defendant.

**AUTHORITY FOR SPRINT'S PROPOSALS:**

Sprint requests balancing instructions based on AIPLA Model Jury Instructions, § 10.0. Sprint requests particularized instruction on reasonable royalty based on *Bio-Rad Labs., Inc. v. 10X Genomics, Inc.*, No. 15-0152 (D. Del. Nov. 13, 2018), D.I. 470 (final jury instructions), § Instruction 6.1 at 30.

Sprint requests instruction that damages be tied to the value of the patent from Sprint Commc'ns Co. L.P. v. Cox Commc'ns Inc., No. 1:12-cv-00487-JFB-CFB (D. Del. Nov. 30, 2017), D.I. 712 (final jury instructions), Instruction 5.1 at 46.

### 5.2   REASONABLE ROYALTY—DEFINITION [[Sprint proposes adding: AND "HYPOTHETICAL NEGOTIATION"]]

A royalty is a payment made to a patent holder in exchange for the right to make, use or sell the claimed invention. This right is called a "license." A reasonable royalty is the payment for the license that would have resulted from a hypothetical negotiation between the patent holder and the alleged infringer taking place at the time when the infringing activity first began. In considering the nature of this negotiation, you must assume that both parties would have acted reasonably and would have **[[Sprint's Proposal:** willingly]] entered into a license agreement. **[[Sprint's Proposal:** Of course, we know that the patent holder and alleged infringer did not agree to a license and royalty payment. But, in order to decide on the amount of reasonable royalty damages, you should assume that the patent holder and alleged infringer did negotiate a license just before infringement began.]]** You must also assume that both parties believed the patent was valid and infringed. Further, you must assume that the parties to the hypothetical negotiation had full knowledge of the facts and circumstances surrounding the infringement at the time, even though some of those facts and circumstances would have actually been unknown to them. You may also consider evidence of events after the hypothetical negotiation date that the parties would have reasonably anticipated at the time. Your role is to determine what the result of that negotiation would have been. The test for damages is what royalty would have resulted from the hypothetical negotiation and not simply what either party would have preferred.

**[[Sprint's Proposal:** Damages are not based on a hindsight evaluation of what happened, but on what the parties to the hypothetical license negotiations would have agreed upon. Nevertheless, evidence relevant to the negotiation is not necessarily limited to facts that occurred on or before the date of the hypothetical negotiation. You may also consider information the parties would have foreseen or estimated during the hypothetical negotiation, which may under certain

circumstances include evidence of usage after infringement started, transactions involving the patent license agreements entered into by the parties shortly after the date of the hypothetical negotiation, profits earned by the infringer, and non-infringing substitutes.

The parties dispute the date of the hypothetical negotiation: TC Tech contends the hypothetical negotiation would have occurred on July 15, 2012; Sprint contends the hypothetical negotiation would have occurred on November 12, 2011. It is you, the jury, who will decide what the date of the hypothetical negotiation would have been. The date of the hypothetical negotiation is the date on which infringement, if you find any, began.]] [27]

A royalty can be calculated in several different ways and it is for you to determine which way is the most appropriate based on the evidence you have heard. You should consider all the facts known and available to the parties at the time the infringement began. Some of the factors you may consider in making your determination are:

(1)     The value that the claimed invention contributes to Sprint's data services.

(2)     The value that factors other than the claimed invention contribute to Sprint's data services.

---

[27] **TC Tech's footnote:** TC Tech objects to this request, including Sprint's proposals in the first paragraph, as unduly risking confusion, unsupported by admissible evidence, and placing prejudicial emphasis on a period during which Sprint cannot show infringement was occurring.

**Sprint's Response:** First, TC Tech's objection regarding a given period of time has no bearing on the first paragraph of Sprint's request, which accurately describes the hypothetical negotiation as a "willing licensor-willing licensee" approach, *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009), and provides additional explanation for the jury. Second, regarding the second paragraph, Sprint's request accurately reflects the jury's role in finding the date of the hypothetical negotiation. Sprint intends to present evidence from which jury can find the accused activity—uploading data from mobile devices according to the LTE standard—began on November 12, 2011, as Sprint contends. Third, Sprint does not have a burden to show that infringement was occurring, as TC Tech suggests.

(3)    Comparable **[[TC Tech's Proposal:** license agreements**]] [[Sprint's Proposal:** transactions**]]**[28], if any exist, such as those covering the use of the claimed invention or similar technology.

**[[TC Tech's Proposal:** One way to calculate a royalty is to determine what is called an "ongoing royalty." To calculate an ongoing royalty, you must first determine the "base," that is, the product on which the alleged infringer is to pay. You then need to multiply the revenue the defendant obtained from that base by the "rate" or percentage that you find would have resulted from the hypothetical negotiation. For example, if the patent covers a nail, and the nail sells for $1, and the licensee sold 200 nails, the base revenue would be $200. If the rate you find would have resulted from the hypothetical negotiation is 1%, then the royalty would be $2, or the rate of 0.01 times the base revenue of $200. By contrast, if you find the rate to be 5%, the royalty would be $10, or the rate of 0.05 times the base revenue of $200. These numbers are only examples, and are not intended to suggest the appropriate royalty rate.

---

[28]  **TC Tech's footnote:**  TC Tech objects to Sprint's request to change the *Georgia-Pacific* factors, as such a change is confusing, misleading, not supported by the law and prejudicial to TC Tech.  Under the law, the jury must decide what a reasonable royalty for Sprint to license to the patent would be; the purchase price of the sale of the patent is not relevant to this inquiry, and does not fall within the *Georgia-Pacific* factors for determining a reasonable royalty.

**Sprint's Response:** Sprint's proposal here does not alter the *Georgia-Pacific* factors, which are listed in a different instruction entirely. *See* Instruction 5.3, *infra.* Even if it did, the *Georgia-Pacific* factors are not "a talisman for royalty rate calculations," *Ericsson, Inc. v. D-Link Systems, Inc.*, 773 F.3d 1201, 1230 (Fed. Cir. 2014), and should be adjusted or supplemented where the facts of the case warrant it. *See also id.* at 1231 ("Several *other Georgia-Pacific* factors would at least need to be adjusted for RAND-encumbered patents—indeed, for SEP patents generally."); *Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1393 (Fed. Cir. 2003) ("Factors relevant in a reasonable royalty determination using [the hypothetical negotiation] method include those set out in *Georgia-Pacific*." (emphasis added)); *GPNE Corp. v. Apple, Inc.*, No. 12-CV-02885-LHK, 2014 WL 1494247, at *2 (Apr. 16, 2014) ("The Georgia-Pacific factors are a non-exhaustive list . . ..").

Instead of a percentage royalty, you may decide that the appropriate royalty that would have resulted from a hypothetical negotiation is a fixed number of dollars per unit sold. If you do, the royalty would be that fixed number of dollars times the number of units sold.

If the patent covers only part of the product or service that Sprint sells, then the base would normally be only that feature or step. For example, if you find that for a $100 car, the patented feature is the tires which sell for $5, the base revenue would be $5.]] [29]

The royalty must reflect the value attributable to the infringing features of the product, and no more. When the accused infringing products have both patented and unpatented features, measuring this value requires you to identify and award only the value of the patented features.

**[[TC Tech Proposal:** Another]] **[[Sprint Proposal:** One]]** way to calculate a royalty is to determine a one-time lump sum payment that the alleged infringer would have paid at the time of the hypothetical negotiation for a license covering all sales of the licensed product, both past and future. **[[TC Tech Proposal:** This differs from payment of an ongoing royalty because, with an ongoing royalty, the licensee pays based on the revenue of actual licensed products it sells.]]** When a one-time lump sum is paid, the alleged infringer pays a single price for a license covering both past and future infringing sales. **[[TC Tech Proposal**: It is up to you, based on the evidence, to decide what type of royalty is appropriate in this case for the life of the patent.]]**

---

[29] **Sprint's footnote:**  There are no remaining damages theories in the case that would propose a reasonable royalty structured as an ongoing royalty. (*See generally* D.I. 393 at 4-18, 24-32; D.I. 437 at 3-5.) Accordingly, Sprint objects that TC Tech's proposed instruction regarding ongoing royalties is unnecessary and likely to confuse the jury. Likewise, references to ongoing royalties appearing subsequently in the instruction are unnecessary and likely to confuse the jury.

**TC Tech's response**: TC Tech's proposed language is based on the model instructions and is an accurate statement of the law.  It is further relevant because the jury is free to craft a reasonable royalty based on the evidence that will be presented at trial regarding Sprint's use of the patent during the period of infringement.

**AUTHORITY FOR AGREED INSTRUCTIONS**:

N.D. Cal. Model Patent Jury Instructions B.5.7; *E.I. Du Pont De Nemours & Co. v. Unifrax I LLC*, No. 1:14-cv-01250-RGA (D. Del. May 15, 2017), D.I. 325 (final jury instructions) Instruction 6.9 at 38; Federal Circuit Bar Association Model Patent Jury Instructions B.6.6, 6.7.

**AUTHORITY FOR TC TECH'S PROPOSALS:**

N.D. Cal. Model Patent Jury Instructions B.5.7 (citing *Garretson v. Clark,* 111 U.S. 120 (1884); *Ericsson v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014); *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1326–34 (Fed. Cir. 2014); *LaserDynamics, Inc. v. Quanta Computer, Inc.,* 694 F.3d 51, 67–68 (Fed. Cir. 2012); *Lucent v. Gateway,* 580 F.3d 1301, 1336–39 (Fed. Cir. 2009)*; Golight, Inc., v. Wal-Mart Stores, Inc.*, 355 F.3d 1327, 1338 (Fed. Cir. 2004); *Maxwell v. Baker, Inc.*, 86 F.3d 1098, 1108–10 (Fed. Cir. 1996); *Mahurkar v. C.R. Bard, Inc.*, 79 F.3d 1572, 1579–81 (Fed. Cir. 1996); *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1554 (Fed. Cir. 1995) (en banc); *Mobil Oil Corp. v. Amoco Chemicals Corp.*, 915 F. Supp. 1333, 1353 (D. Del. 1994); *Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970); *ResQNet.com, Inc. v. Lansa*, Inc., 594 F.3d 860, 869 (Fed. Cir. 2010)); *see E.I Du Pont De Nemours & Co. v. Unifrax I LLC*, No. 1:14-cv-01250-RGA (D. Del. May 15, 2017), D.I. 325 (final jury instructions) Instruction 6.9 at 38.

**AUTHORITY FOR SPRINT'S PROPOSALS:**

AIPLA Model Jury Instructions §§ 10.2.5.2, 10.2.5.7; *Bio-Rad Labs., Inc. v. 10X Genomics, Inc.*, No. 15-0152 (D. Del. Nov. 13, 2018), D.I. 470 (final jury instruction), Instruction 6.3 at 32; *see Apple Inc. v. Motorola Inc.*, 757 F.3d 1286 (Fed. Cir. 2014); *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 75 (Fed. Cir. 2012); *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1311 (Fed. Cir. 2011); *Fujifilm Corp. v. Benun*, 605 F.3d 1366, 1372 (Fed. Cir. 2010); *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324-25 (Fed. Cir. 2009); *Mahurkar v. C.R. Bard, Inc.*, 79 F.3d 1572, 1579 (Fed. Cir. 1996); *Maxwell v. J. Baker, Inc.*, 86 F.3d 1098, 1109-10 (Fed. Cir. 1996); *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1554 (Fed. Cir. 1995) (en banc); *Wang Labs., Inc. v. Toshiba Corp.*, 993 F.2d 858, 870 (Fed. Cir. 1993).

### 5.3  FACTORS FOR DETERMINING REASONABLE ROYALTY

In determining the reasonable royalty, you should consider all the facts known and available to the parties at the time the infringement began. Some of the kinds of factors that you may consider in making your determination are:

1.     **[[TC Tech's Proposal:** The commercial relationship between TC Tech and Sprint, such as, whether they are competitors in the same territory in the same line of business;**]]**

> **Sprint's Proposal:** The commercial relationship between the parties to the hypothetical negotiation, such as, whether they are competitors in the same territory in the same line of business; or whether they are inventors or promoters;**]]**

2.     The duration of the patent and the term of the license;

3.     The established profitability of the service provided under the patent, its commercial success, and its popularity;

4.     The utility and advantages of the patented invention over the old modes or devices, if any, that had been used for working out similar results;

5.     The nature of the patented invention, and the benefits to those who have used the invention;

6.     The extent to which Sprint has made use of the invention, and any evidence probative of the value of that use;

7.     The portion of profit or selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions;

8.      The portion of the profit that arises from the patented invention itself as opposed to profit arising from unpatented features, such as the manufacturing process, business risks, or significant features or improvements added by the accused infringer;

9.      The opinion testimony of qualified experts; and

10.      The amount that a licensor (such as TC Tech **[[Sprint's Proposal:** or CableLabs**]]**) and a licensee (such as Sprint) would have agreed upon at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee—who desired, as a business proposition, to obtain a license to provide a particular service embodying the patented invention—would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license. No one factor is dispositive, and you can and should consider the evidence that has been presented to you in this case on each of these factors.

You may also consider any other factors which in your mind would have increased or decreased the royalty Sprint would have been willing to pay and TC Tech would have been willing to accept, acting as normally prudent business people. The final factor establishes the framework which you should use in determining a reasonable royalty, that is, the payment that would have resulted from a negotiation between TC Tech and Sprint taking place before Sprint's infringement began.

**[[TC Tech's Proposal on non-infringing substitute:** In determining a reasonable royalty, you may also consider whether Sprint had any non-infringing alternative for the patented invention. A non-infringing substitute is available if Sprint had all the necessary equipment, materials, know-how, and experience to design and implement the substitute and use the substitute instead of its infringing service at the time the infringing service was sold. An acceptable non-

infringing substitute must include the advantages of the patented invention that were important to the actual customers for the Sprint's LTE data service.[30]**]]**

**[[Sprint's Proposal on non-infringing substitute:** In determining a reasonable royalty, you may also consider whether Sprint reasonably believed[31] it had any non-infringing substitute for the patented invention at the time of the hypothetical negotiation. A non-infringing substitute is available if it was on the market or if Sprint had or could obtain the necessary equipment, materials, know-how, and experience to provide the substitute service instead of its infringing service at the time the infringing service was sold. You should also consider whether Sprint

---

[30] **Sprint's footnote:** A substitute can be "available" if it is on the market, though that is not a requirement of availability. *Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 875 F.3d 1369, 1381 (Fed. Cir. 2017); *Grain Processing Corp. v. Am. Maize-Prods. Co.*, 185 F.3d 1341, 1351 (Fed. Cir. 1999). TC Tech's proposal incorrectly suggests that Sprint must be capable of designing and manufacturing all the necessary equipment on its own rather than purchasing commercially available goods and services that would enable Sprint to offer a substitute service. TC Tech cites no authority for this proposition. TC Tech's proposed instruction also provides an inaccurate statement of the law regarding "acceptability" of substitutes in that TC Tech must show customer demand for advantages linked to particular claim features. *See Mentor Graphics Corp. v. EVE-USA, Inc.*, 851 F.3d 1275, 1285 (Fed. Cir. 2017) (patentees must prove the absence of noninfringing alternatives); *Grain Processing*, 185 F.3d at 1354 (holding that customers would have found a particular claim limitation 'irrelevant,' so the patentee could not rely on that limitation to show a substitute was not acceptable).

[31] **TC Tech's footnote:** The state of mind of the infringer is not relevant to the availability of a non-infringing substitute. *See Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 875 F.3d 1369, 1381 (Fed. Cir. 2017) (considering whether there was or was not an acceptable substitute); *Grain Processing Corp. v. Am. Maize-Prods. Co.*, 185 F.3d 1341, 1349 (Fed. Cir. 1999). Mixing a subjective component into this standard would be confusing to the jury and prejudicial. As important, the parties already have agreed upon a suitable instruction to the jury that explains the states of mind of the parties to the hypothetical negotiation, namely that both are "act[ing] reasonably," know the patent is "valid and infringed" and that the jury "should consider all the facts known and available to the parties at the time the infringement began." Supra at 6.2.

**Sprint's Response:** The state of mind of the parties to the hypothetical negotiation is the relevant question when using a hypothetical negotiation framework. *See Aqua Shield v. Inter Pool Cover Team*, 774 F.3d 766, 770 (Fed. Cir. 2014) ("[T]he core economic question is what the infringer, in a hypothetical preinfringement negotiation under hypothetical conditions, would have anticipated . . .."). *Presidio* and *Grain Processing* both address the meaning of "available" in the context of a lost-profits analysis, which looks for actual injury, *i.e.*, what would actually have happened but for any infringement. *See Presidio*, 875 F.3d at 1381 ("The 'but for' inquiry therefore requires a reconstruction of the market . . .." (quoting *Grain Processing*, 185 F.3d at 1350)). Thus, while *Presidio* and *Grain Processing* inform the meaning of "available," the question in a hypothetical negotiation remains whether the licensee would have anticipated a substitute to be available.

reasonably believed the substitute service would have been acceptable to its customers. If TC Tech shows that demand for Sprint's LTE data services resulted from a particular feature of the claimed invention, a substitute would need to have that feature to be acceptable.]]

[[**Sprint's Proposal:** You have also heard evidence regarding the sale of the '488 patent by a tax-exempt organization. I remind you that testimony about the law governing tax-exempt organizations may be evidence of a person's understanding of that law, but it is the Court's responsibility to explain the law. Tax-exempt organizations are prohibited from giving their earnings to their members in the form of money or other valuable property.  They may sell property to members, but only at a fair market value. Violating this rule would cause an organization to lose its tax-exempt status.]][32]

**AUTHORITY FOR AGREED INSTRUCTIONS**:
> *Sprint Commc'ns Co. L.P. v. Comcast Cable Commc'ns, LLC*, No. 1:12-cv-01013-RGA (D. Del. Feb. 5, 2015), D.I. 264 (final jury instructions) Instruction 4.3 at 23-24; ; Federal Circuit Bar Association Model Patent Jury Instructions B.6.7; *Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970).

---

[32] **TC Tech's footnote:** The jury should not be instructed on tax law in this case, particularly the one-sided and unduly prejudicial instruction proposed by Sprint. The proposed instruction risks creating a trial within a trial over an issue that goes only to the state of mind of the parties—and once again reveals that Sprint must be prevented from placing undue and improper emphasis on the sale price of the '488 patent. TC Tech will not dignify Sprint's attempt to inject this issue into jury instructions by proposing an alternative that "balances" issues that TC Tech will emphasize, but notes that in addition to the other infirmities, Sprint's proposal would leave the jury with a misleadingly incomplete impression about applicable tax law.

**Sprint's Response:** The sale of the '488 patent is a relevant transaction, so Sprint's presentation of the sale agreement and related evidence is neither undue nor improper. Sprint proposes an instruction to avoid submitting an unresolved question of law to the jury based on the testimony of witnesses rather than on the instruction of the Court. If TC Tech disagrees with the accuracy of the instruction, it had the opportunity to propose an alternative instruction.

**AUTHORITY FOR TC TECH'S PROPOSALS:**

> The phrasing of TC Tech's requested *Georgia Pacific* factors comes from AILPA Model Patent Jury Instruction 10.2.5.3.
>
> The first two sentences of TC Tech's requested non-infringing substitute request is taken from *Bayer v. Balaxia,* No. 1:16-cv-1122-RGA (D. Del. Jan. 31, 2019), D.I. 381 (proposed final instructions) [Undisputed] Instruction 6.4, at p. 64. The third sentence is from N.D. Cal. Model Patent Jury Instructions 5.3.3b.

**AUTHORITY FOR SPRINT'S PROPOSALS:**

> Sprint requests the instructions reflect the facts of the case, *i.e.*, that the accused instrumentality is a service that is provided, not a product to be manufactured and sold. Sprint requests accurate instructions on the law governing non-infringing substitutes, which permit Sprint to acquire equipment, etc. from third-parties and to show availability by reference to commercially available products and services and require the patent owner to show demand based on a feature of the patented invention to show that a substitute was not acceptable. *See Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 875 F.3d 1369, 1381 (Fed. Cir. 2017); *Grain-Processing Corp. v. Am. Maize-Prod. Co.*, 185 F.3d 1341, 1353-54 (Fed. Cir. 1999). Sprint further requests that the instructions on noninfringing substitutes reflect the hypothetical negotiation framework, which looks at what the negotiating parties would have anticipated at the time. *Aqua Shield v. Inter Pool Cover Team*, 774 F.3d 766, 770 (Fed. Cir. 2014).
>
> Because the jury may hear testimony regarding tax law applicable to tax-exempt organizations from witnesses, the jury should have the benefits of the Court's instruction to avoid any potential for confusion. The requested instruction is based on 26 U.S.C. § 501(c)(3), (6); *Anclote Psychiatric Ctr. v. Commss'r, Tax Ct.* Dkt. No. 4810-92, 1998 Tax Ct. Memo LEXIS 276, *21-25 (Tax Ct. Jul. 27, 1998); *Church of Scientology v. Commss'r*, 823 F.2d 1310, 1316-17 (9th Cir. 1987)..

**[[TC Tech's Proposal**:

## 5.4  REASONABLE ROYALTY—PATENT EXPIRATION

The '488 patent expired on September 28, 2015. The fact that the patent has expired is not relevant to infringement or validity. TC Tech is only seeking damages for sales of products for the period before the date of expiration.**]]**

**AUTHORITY:**

> *AVM Technologies, LLC v. Intel Corp.*, No. 1:15-cv-33-RGA (May 8, 2017), D.I. 719 (final jury instructions) Instruction No. 6.4 at p. 27.

**[[Sprint's Proposal:**

## 5.5  REASONABLE ROYALTY—APPORTIONMENT

The amount you find as damages must be based on the value attributable to the patented technology, as distinct from other, unpatented features of the accused product, or other factors such as marketing or advertising, Sprint's capital investment, and Sprint's size or market position.

In addition, you have heard evidence that the asserted patent is a standard essential patent, that is, that Sprint could not have practiced the LTE standard without infringing the patent. A patent can be essential to a standard, even if it was not formally declared essential to the standard or made subject to an obligation that it be licensed under fair, reasonable and nondiscriminatory (FRAND) terms. It is up to you to decide whether TC Tech has proven by a preponderance of the evidence that the '488 patent was essential to the LTE standard. If you agree that the patent was essential to the LTE standard, you must ensure that your damages award reflects only the value of the patented invention and not the additional value that resulted from the patent's inclusion in the LTE standard and widespread adoption of that standard. In other words, you may not consider the success of the standard itself in determining a reasonable royalty for the patent-in-suit.

If you agree that the patent was essential to the LTE standard, you should also consider any evidence of patent hold-up and royalty stacking when determining a reasonable royalty. Patent hold-up exists when the holder of a standard-essential patent demands excessive royalties after companies are locked into using a standard. Royalty stacking can arise when a standard implicates numerous patents. If companies are forced to pay royalties to all standard-essential patent holders, the royalties will "stack" on top of each other and may become excessive in the aggregate.]][33]

---

[33] **TC Tech's footnote**: TC Tech objects to this request in its entirety. TC Tech objects that apportionment is adequately covered in the Georgia Pacific factors and that undue emphasis

## **AUTHORITY FOR SPRINT'S PROPOSAL:**

> AIPLA Model Jury Instructions § 10.2.5.4 (citing *Exmark Mfg. Co., v. Briggs & Stratton Power Group*, 879 F.3d 1332, 1348 (Fed. Cir. 2018): *AstraZeneca AB v. Apotex Corp.*, 782 F.3d 1324, 1339 (Fed. Cir. 2015); *Ericsson, Inc. v. D-Link Sys.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014); *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1319 (Fed. Cir. 2014); *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308 (Fed. Cir. 2014); *Versata Software, Inc. v. SAP Am., Inc.*, 717 F.3d 1255 (Fed. Cir. 2013); *LaserDynamics, Inc. v. Quanta Computer, Inc. et al*, 694 F.3d 51, 60 (Fed. Cir. 2012); *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1317 (Fed. Cir. 2011); *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010); *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1336 (Fed. Cir. 2009); *Imonex Svcs. Inc. v. W.H. Munzprufer Dietmar Trenner GMBH*, 408 F.3d 1374 (Fed. Cir. 2005)) and Federal Circuit Bar Association Model Patent Jury Instructions B.6.7 (citing *Ericsson, Inc. v. D-Link Sys.*, 773 F.3d 1201, 1209, 1233 (Fed. Cir. 2014); *Commonwealth Sci. & Indus. Res. Org. v. Cisco Sys.*, 809 F.3d 1295, 1304 (Fed. Cir. 2015)); *Chrimar Sys., Inc. v. Alcatel-Lucent Enter. USA Inc.*, No. 6:15-cv-

---

on this factor will be prejudicial and that there is no evidence supporting any legitimate contention for hold-up and royalty stacking in the case, let alone a jury instruction that will place undue and prejudicial emphasis on this issue. TC Tech also objects insofar as this instruction talks about standard essential patents and FRAND, which are likely to confuse the jury at least because Sprint has presented no evidence that anyone, let alone a standards-setting organization or patent owner, ever has dedicated the patent-in-suit to a standards-setting organization and committed to offering licenses at FRAND terms in order to receive corresponding benefits such as cross-licenses to other patents.

**Sprint's Response:** "[A] royalty award for a SEP [standard essential patent] must be apportioned to the value of the patented invention (or at least to the approximate value thereof), not the value of the standard as a whole. *A jury must be instructed accordingly.*" *Ericsson, Inc. v. D-Link Sys.*, 773 F.3d 1201, 1233 (Fed. Cir. 2014) (emphasis added). A SEP is a patent that "[standard-]compliant devices *necessarily* infringe," *id.* at 1209, which is consistent with TC Tech's contentions—disputed ones—in this case. Whether a patent is an SEP is a distinct inquiry from whether it is subject to FRAND obligations or declared essential to a standard-setting body. *See Commonwealth Sci. & Indus. Research Org. v. Cisco Sys., Inc.*, 809 F.3d 1295, 1304-05 (Fed. Cir. 2015). If TC Tech is permitted to present any of the disclosed opinions of its damages expert, Mr. Reed, the jury will hear evidence about standard essential patents and FRAND licensing terms, making this instruction necessary. TC Tech is incorrect that there is "no evidence supporting any legitimate contention for hold-up and royalty stacking in the case," including because its own damages expert acknowledges that it is "the practice in the industry" that "royalties for LTE-related standard essential patents are typically applied to the sales of handset device suppliers, who then pass on those royalties in the form of higher handset prices to resellers like Sprint," Opening Reed Report, p. 8-9, and discusses particular "known industry royalty rates" for handsets that he claims that "inform the range of royalty rates applicable for various LTE technology suppliers, both in current terms and compared to the expectations of 2009." *Id.* at pp. 140-143. Sprint addresses the evidence for hold-up in its opposition to TC Tech's MIL No. 1, on which the Court reserved judgment, to the extent it "become[s] relevant in questioning." (*See* D.I. 433 at 1.)

00163-JDL, 2017 WL 568712, at *6-7 (E.D. Tex. Feb. 13, 2017). Sprint requests instructions regarding hold-up and royalty stacking based on *Ericsson, Inc. v. D-Link Sys.*, 773 F.3d 1201, 1231 (Fed. Cir. 2014).

**[[Sprint Proposal:**

### 5.6 REASONABLE ROYALTY—USE OF COMPARABLE TRANSACTIONS GRANTING PATENT RIGHTS

When determining a reasonable royalty, you may consider evidence concerning the amounts that parties have actually paid for rights to the patent in question or for rights to similar technologies. A sale or other transaction need not be perfectly comparable to a hypothetical license that would be negotiated between the parties to the hypothetical negotiation in order for you to consider it. However, if you choose to rely upon evidence of any other sale or other transaction, you must account for any differences between that transaction and the hypothetically negotiated license, in terms of the rights granted, technologies, and economic circumstances of the contracting parties, when you make your reasonable royalty determination.

While an earlier sales price of a patent is not a cap on the reasonable royalties that can be awarded for infringing that patent, you are free to reject a royalty number if you conclude that it is unbalanced in view of an earlier sales price for that patent. Likewise, you are free to reject a royalty number that is a multiple of the average amount of agreements in evidence if you do not believe there is an adequate evidentiary basis for this difference.]]**[34]**

---

[34] **TC Tech's footnote**: TC Tech objects to this request in its entirety. TC Tech objects that the concept of comparable transactions is adequately covered in the instructions on the *Georgia Pacific* factors, and no single fact relating to damages, regardless of Sprint's view of its relevance, should be the subject of a single, stand-alone instruction to the jury that would inevitably be perceived as more heavily emphasized by the Court than other equally relevant facts. TC Tech further disagrees with Sprint's claim that, without a separate instruction, the jury will not be instructed on this issue at all. To the contrary, the jury will be instructed on the hypothetical negotiation, which is factor 15 of the *Georgia-Pacific* analysis, and Dr. Cox's testimony regarding the purchase price is adequately and properly covered by this instruction. A separate instruction to the exclusion of instructions directed to all of the theories of each expert related to the hypothetical negotiation would thus serve only to elevate Sprint's preferred theory over all others, and is unduly prejudicial to TC Tech. Sprint's request for this instruction is, once again, designed to permit Sprint to place undue and prejudicial emphasis on the $300,000 purchase price of the '488 patent in a manner that will confuse the jury, and duplicative of Sprint's earlier request.

**AUTHORITY FOR SPRINT'S PROPOSAL:**

AIPLA Model Patent Jury Instructions, § 10.2.5.9 (citing *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1227-28 (Fed. Cir. 2014); *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1330-31 (Fed. Cir. 2014); *Apple Inc. v. Motorola Inc.*, 757 F.3d 1286, 1325-26 (Fed. Cir. 2014); *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 77-81 (Fed. Cir. 2012); *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869-70 (Fed. Cir. 2010); *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1329, 1336 (Fed. Cir. 2009); *Bio-Rad Labs., Inc. v. 10X Genomics, Inc.*, No. 15-0152 (D. Del. Nov. 13, 2018), D.I. 470 (final jury instructions), Instruction 6.4 at 35; *Whitserve, LLC v. Computer Packages, Inc.*, 694 F.3d 10, 31 (Fed. Cir. 2012); *Lucent Techs.*, 580 F.3d at 1332; and *Integra Lifesciences I, Ltd. v. Merck KGaA*, 331 F.3d 860, 871 (Fed. Cir. 2003), vacated and remanded on FDCA Safe Harbor grounds, 545 U.S. 193 (2005).

---

Further, Sprint's reliance on *Spectralytics, Inc. v. Cordis Corp.*, 650 F. Supp. 2d 900, 916 (D. Minn. 2009) is misplaced, as the Court there *rejected* the defendant's attempt to argue that a purchase price capped or limited the amount of a reasonable royalty because "[t]he jury could reasonably have concluded that the [purchase price] had little to do with the [hypothetical negotiation]" and so given it "very little weight." *Id.* at 914. That case did not involve damages relayed jury instructions at all, and so did not suggest that a separate jury instruction, apart from the standard *Georgia-Pacific* instruction on the hypothetical negotiation, was warranted to highlight the fact that the patent had been sold. In addition, Sprint's proposed instruction is misleading, confusing and a misstatement of the applicable law.

**Sprint's Response:** *Georgia-Pacific* factor 2 only refers to royalties Sprint has paid for licenses to comparable patents. This instruction deals with different patents (*i.e.*, not Sprint) engaged in transactions involving the actual patent-in-suit (*i.e.*, not comparable patents). Furthermore, the Court excluded all damages theories relying on comparable licenses (*see generally* D.I. 393 at 4-18, 24-32; D.I. 437 at 3-5), so an instruction on *Georgia-Pacific* factor 2 is no longer appropriate. Accordingly, this instruction is not duplicative of the *Georgia-Pacific* factors. Indeed, without Sprint's proposal, the jury may hear no relevant instruction on this issue at all. Moreover, the sale of the '488 patent is a relevant transaction, so Sprint's presentation of the sale agreement and related evidence is neither undue nor improper. The jury must decide how much weight to give the evidence of the price TC Tech paid to acquire the patent and should be guided by appropriate instructions in this decision. *See Spectralytics, Inc. v. Cordis Corp.*, 650 F. Supp. 2d 900, 916 (D. Minn. 2009), *aff'd in part, vacated in part*, 649 F.3d 1336 (Fed. Cir. 2011) ("[W]eighing the evidence about [an acquisition including the patent-in-suit] [is] a task for the jury, . . ..").  As TC Tech concedes, the *Spectralytics* court declined to overturn a jury verdict because it was the jury's job to decide how much weight to give the purchase price of a patent. The jury must be instructed how to do that, yet TC Tech objects to including any similar instructions within other lists of relevant factors. *See, e.g.*, Instruction 5.2, *supra*. Thus, TC Tech's objection to adding a separate instruction lacks credibility. Furthermore, TC Tech's reliance on the findings of the *Spectralytics* jury is misplaced. How the jury weighed the evidence in that case is irrelevant to this case.

## 6.   __DELIBERATION AND VERDICT__

### 6.1  INTRODUCTION

That concludes the part of my instructions explaining the rules for considering some of the testimony and evidence. Now let me finish up by explaining some things about your deliberations in the jury room, and your possible verdicts.

Once you start deliberating, do not talk to the jury officer, or to me, or to anyone else except each other about the case. If you have any questions or messages, you must write them down on a piece of paper, sign them, and then give them to the jury officer. The officer will give them to me, and I will respond as soon as I can. I may have to talk to the lawyers about what you have asked, so it may take me some time to get back to you. Any questions or messages normally should be sent to me through your foreperson, who by custom of this Court is juror No. 1.

One more thing about messages. Do not ever write down or tell anyone how you stand on your votes. For example, do not write down or tell anyone that you are split 4-4, or 6-2, or whatever your vote happens to be. That should stay secret until you are finished.


**AUTHORITY**:      *Sprint Commc'ns Co. L.P. v. Comcast Cable Commc'ns*, LLC, No. 1:12-cv-01013-RGA (D. Del. Feb. 5, 2015), D.I. 264 (final jury instructions) at 25; *Bio-Rad Labs., Inc. v. 10X Genomics, Inc.*, No. 1:15-cv-00152 (D. Del. Nov. 13, 2018), D.I. 470 (final jury instructions), Instruction 7.1 at 37.

## 6.2  UNANIMOUS VERDICT

Your verdict must represent the considered judgment of each juror. In order for you as a jury to return a verdict, it is necessary that each juror agree to the verdict. Your verdict must be unanimous.

It is your duty, as jurors, to consult with one another and to deliberate with a view towards reaching an agreement, if you can do so consistent with your individual judgment. Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors. In the course of you deliberations, do not hesitate to reexamine your own views and change your opinion, if convinced it is erroneous. But do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors, or for the purpose of returning a verdict. Remember at all times that you are not partisans. You are judges of the facts. Your sole interest is to seek the truth from the evidence in the case.

A form of verdict has been prepared for you. You will take this form to the jury room and when you have reached unanimous agreement as to your verdict, you will have your foreperson fill in, date and sign the form. You will then return to the courtroom and your foreperson will give your verdict.

It is proper to add the caution that nothing said in these instructions and nothing in the form of verdict is meant to suggest or convey in any way or manner any intimation as to what verdict I think you should find. What the verdict shall be is the sole and exclusive duty and responsibility of the jury.

**AUTHORITY**:  *Sprint Commc'ns Co. L.P. v. Comcast Cable Commc'ns, LLC*, No. 1:12-cv-01013-RGA (D. Del. Feb. 5, 2015), D.I. 264 (final jury instructions) at 26; *Bio-Rad Labs., Inc. v. 10X Genomics, Inc.*, No. 1:15-cv-00152 (D. Del. Nov. 13, 2018), D.I. 470 (final jury instructions), Instruction 8 at 38.

## 6.3  DUTY TO DELIBERATE

Now that all the evidence is in and the arguments are completed, you are free to talk about the case in the jury room. In fact, it is your duty to talk with each other about the evidence, and to make every reasonable effort you can to reach unanimous agreement. Talk with each other, listen carefully and respectfully to each other's views, and keep an open mind as you listen to what your fellow jurors have to say. Try your best to work out your differences. Do not hesitate to change your mind if you are convinced that other jurors are right and that your original position was wrong.

But do not ever change your mind just because other jurors see things differently, or just to get the case over with. In the end, your vote must be exactly that—your own vote. It is important for you to reach unanimous agreement, but only if you can do so honestly and in good conscience.

No one will be allowed to hear your discussions in the jury room, and no record will be made of what you say. So you should all feel free to speak your minds.

Listen carefully to what the other jurors have to say, and then decide for yourself.


**AUTHORITY**:       *Sprint Commc'ns Co. L.P. v. Comcast Cable Commc'ns, LLC*, No. 1:12-cv-01013-RGA (D. Del. Feb. 5, 2015), D.I. 264 (final jury instructions) at 27; *Bio-Rad Labs., Inc. v. 10X Genomics, Inc.*, No. 1:15-cv-00152 (D. Del. Nov. 13, 2018), D.I. 470 (final jury instructions), Instruction 9 at 39.

## 6.4  SOCIAL MEDIA

During your deliberations, you must not communicate with or provide any information to anyone by any means about this case. You may not use any electronic device or media, such as the telephone, a cell phone, smart phone, iPhone, blackberry or computer, the internet, any internet service, any text or instant messaging service, any internet chat room, blog, or platform such as Facebook, Instagram, LinkedIn, YouTube or Twitter to communicate to anyone any information about this case or to conduct any research about this case until I accept your verdict. In other words, you cannot talk to anyone on the phone, correspond with anyone, or electronically communicate with anyone about this case. You can only discuss the case in the jury room with your fellow jurors during deliberations.

**AUTHORITY**:        *Sprint Commc'ns Co. L.P. v. Comcast Cable Commc'ns, LLC*, No. 1:12-cv-01013-RGA (D. Del. Feb. 5, 2015), D.I. 264 (final jury instructions) at 28; *Bio-Rad Labs., Inc. v. 10X Genomics, Inc.*, No. 1:15-cv-00152 (D. Del. Nov. 13, 2018), D.I. 470 (final jury instructions), Instruction 10 at 40.

## 6.5  COURT HAS NO OPINION

Let me finish up by repeating something that I said to you earlier. Nothing that I have said or done during this trial was meant to influence your decision in any way. You must decide the case yourselves based on the evidence presented.

|                |                                                                 |
|----------------|-----------------------------------------------------------------|
| **AUTHORITY**: | *Sprint Commc'ns Co. L.P. v. Comcast Cable Commc'ns, LLC*, No. 1:12-cv-01013-RGA (D. Del. Feb. 5, 2015), D.I. 264 (final jury instructions) at 29; *see Bio-Rad Labs., Inc. v. 10X Genomics, Inc.*, No. 1:15-cv-00152 (D. Del. Nov. 13, 2018), D.I. 470 (final jury instructions), Instruction 11 at 41. |