

Kelly E. Farnan
302-651-7705
Farnan@rlf.com

September 29, 2021

**VIA CM/ECF**
The Honorable William C. Bryson
United States Court of Appeals for the Federal Circuit
Howard T. Markey National Courts Building
717 Madison Place, N.W.
Washington, DC 20439-0000

Re:  *TC Technology LLC v. Sprint Corporation*, C.A. No. 16-153-WCB

Dear Judge Bryson:

TC Tech filed this case *over five and a half years ago*. The case has been continued on the eve of trial numerous times, once on the very morning opening statements were to be delivered. Each of those continuances was either caused by Sprint or seized on by Sprint as an opportunity to bring new motions and to raise new issues in order to delay trial even further. Sprint's motives for its dilatory conduct were twofold: to indefinitely postpone its accountability to its competitor Charter Communications – TC Tech's parent company – for its infringement (itself significant prejudice to TC Tech), and to obtain a tactical advantage by delaying this trial until Sprint can try its later-filed patent case against Charter. Those are the same motives behind Sprint's stay motion.

All of the applicable stay factors compel denial of Sprint's motion. The "undue prejudice" and "tactical advantage" factors alone warrant denying the motion. Because this case has been "trial ready" *for years*, it is difficult to imagine a case where the "status of the litigation" factor weighs more heavily against a stay. And while Sprint places great reliance on the "simplification of the issues" factor and its contention that it is "exceedingly likely" that the claims of the '488 patent will be cancelled in reexamination, that contention is belied by the fact that Sprint was not able even to satisfy the "reasonably likely" to prevail standard when it unsuccessfully requested institution of an IPR the first time it sought post-grant review.

For these and the other reasons identified below, Sprint's motion should be denied.

**I.  PROCEDURAL HISTORY**

TC Tech filed this case on March 10, 2016 asserting that Sprint infringes both claims of the '488 patent. On January 25, 2017, Sprint filed a petition with the Patent and Trademark Office ("PTO") for *inter partes* review ("IPR") of both claims, alleging that they are invalid over a number of different references. On July 28, 2017, the PTO denied institution of an IPR, finding that Sprint could not demonstrate that it was reasonably likely to prevail on the merits. IPR2017-00771, Paper No. 14.

The case was scheduled to go to trial on May 13, 2019. Although *Markman* proceedings had concluded over a year earlier (D.I. 93), Sprint belatedly sought a claim construction ruling on an additional claim term in its summary judgment motion on December 14, 2018. (D.I. 258 at 22.) Judge Andrews issued a construction of that term on April 15, 2019. (D.I. 354 at 13.). At an April 26, 2019 pretrial conference, Judge Andrews allowed TC Tech to supplement its expert report to account for that new construction. Although TC Tech urged that the trial date be maintained because all required supplementations by both parties could be completed before trial, Sprint

The Honorable William C. Bryson
Page 2

disagreed, arguing that "we need to delay the trial." (D.I. 463 at 69:5-13.) Judge Andrews granted Sprint's delay request (*Id*. at 71:13-15), and the trial was ultimately reset for December 3, 2019. (D.I. 379, 450.)

On the morning of December 3, 2019, the trial was cancelled because of a Court conflict with a criminal trial. (D.I. 479.) The trial was rescheduled for August 24, 2020. (D.I. 487.) On July 17, 2020, that August trial was cancelled due to the pandemic. (D.I. 515.) A month later, on August 21, 2020, Sprint moved for yet another new claim construction, as well as for permission to add a new trial witness to the pretrial order. (D.I. 524, 525.)

Trial was next scheduled to occur on May 10, 2021. On March 9, 2021, that trial too was cancelled due to the pandemic. (D.I. 548.) The trial was rescheduled for November 15, 2021. Immediately after cancellation of the trial, on March 23, 2021, Sprint submitted a request for *ex parte* reexamination of the '488 patent, the reexamination which Sprint now contends requires the cancellation of the November 15 trial.

On April 26, 2021, the Court granted in part Sprint's request to add a new trial witness, and tentatively rejected Sprint's proposed claim construction, requesting additional briefing on the claim construction issue. (D.I. 552, 553.) On May 11, 2021, the PTO instituted reexamination proceedings. Although Sprint now contends that approximately 80% of instituted reexamination proceedings are decided against the patentee, Sprint did not at that time move for a stay of this case. Instead, Sprint proceeded to brief its new claim construction issues, hoping to obtain the construction it alleged would entitle it to a judgment of non-infringement. In the course of that briefing, Sprint sought yet an additional brand new claim construction. (D.I. 577 at 15; D.I. 585 at 1.).

On September 9, 2021, the Court rejected both of Sprint's new constructions. (D.I. 587.) On September 20, the PTO issued a first office action rejection in the reexam that was instituted on May 11, 2021. On September 22, 2021, Sprint moved for the instant stay. (D.I. 591.)

## II. ALL STAY FACTORS WEIGH AGAINST *ANOTHER* TRIAL POSTPONMENT

Sprint's letter brief identifies the three factors to be considered when deciding Sprint's motion. (D.I. 592 at 3.) Each of these factors weighs decidedly against a stay.

### A. A Stay Would Unduly Prejudice TC Tech And Put It At A Clear Tactical Disadvantage

Sprint contends that TC Tech can suffer no prejudice or tactical disadvantage from a stay because it is a "patent assertion entity" that "makes no products, has no market share, has no customers [and] is not a competitor of Sprint…" (D.I. 592 at 5.) As Sprint well knows, however, TC Tech is a subsidiary of Charter Communications, the second largest cable television company in the country with over 26 million customers. And as Sprint also knows, Sprint has a pending patent infringement suit against Charter (the "Second Case") in this district in which it alleges that Sprint *is* a competitor of Charter in that it is asserting entitlement to "lost profits" due to Charter's purported infringement. In fact, as the fierce competitors that they are, Sprint and Charter presently have five intellectual property cases pending against one another. A further delay in trying this case against its "hard-fought" competitor would itself amount to undue prejudice to TC Tech. *SenoRx, Inc. v. Hologic, Inc.*, No. CIV.A. 12-173-LPS, 2013 WL 144255, at *8 (D. Del. Jan. 11, 2013).

Sprint's latest stay request is also another attempt to obtain a tactical advantage (in settlement negotiations[1] and otherwise) by having the Second Case (in which it is the plaintiff) leapfrog this one (in which it is the defendant) for trial. That was the same motive Sprint had back in June of 2020 when it sought to postpone the August 24, 2020 trial in this case due to the pandemic but *not* the October 5, 2020 trial in the Second Case. (D.I. 510.) As TC Tech explained when opposing that request, "[b]ecause this case was filed almost two years before the Second Case, TC Tech asked Sprint to confirm that any stipulated request to continue the trial in this case would be accompanied by a request to continue the trial in the Second Case as well in order to ensure that the order of trials is maintained… Sprint refused to agree…" (D.I. 511.) All of its stay and continuance requests, all of its belated claim construction and other motions, as well as its now ***second*** approach to the PTO for post-grant review, are motivated by its desire to delay trial in this case in order to allow the Second Case to be tried first. Such dilatory motives also weigh against a stay. *Fresenius Med. Care Holdings, Inc. v. Baxter Int'l, Inc.*, No. C 03-1431 SBA, 2007 WL 1655625, at *5 (N.D. Cal. June 7, 2007). Indeed, while Sprint relies heavily on *VirtualAgility Inc. v. Salesforce.com, Inc.*, 759 F.3d 1307, 1319 (Fed. Cir. 2014), the Federal Circuit there expressly noted that "[t]here is no evidence Defendants possessed a 'dilatory motive,' *which would have pointed against a stay*." *Id*. at 1319 (emphasis added).

Although Sprint relies on the AIA legislative history to the effect that "Congress intended 'for district courts to be liberal in granting stays,'" it ignores the fact that the reexam is Sprint's belated ***second*** attempt at obtaining post-grant cancellation. That reexam contravenes Congress's intent: "Multiple staggered petitions challenging the same patent and same claims raise the potential for abuse. . . [They] allow petitioners the opportunity to strategically stage their prior art and arguments in multiple petitions, using our decisions as a roadmap, until a ground is found that results in the grant of review. All other factors aside, *this is unfair to patent owners . . .* [and] *risks harassment of patent owners and frustration of Congress's intent in enacting the Leahy-Smith America Invents Act*. See H.R. Rep. No. 112-98, pt.1, at 48 (2011)." *General Plastic Indus. Co. v. Canon Kabushiki Kaisha*, IPR2016-01357, Paper 19 at 17-18, n. 14. (PTAB Sep. 6, 2017). Sprint's desperate attempt to find new prior art in December of 2020 – three and a half years after the PTO refused to institute an IPR and almost five years after this case began – in order to manufacture grounds to request this stay exemplifies such abuse. That is why Sprint did not, and could not, "argue that there were any changed circumstances that reasonably justified its new prior art searches and associated filing of follow-on petitions." *Id.* at 20.

### B. The Status of The Litigation Factor Weighs Against Staying This Trial-Ready Case

The case is set to be tried in a month and a half. Not only is "discovery complete and a trial date set," virtually all of the pretrial work has been done because *this case has been trial ready for years now*. To be sure, there has been pretrial work done after previous continuances, but that work was the result of Sprint's serial attempts to manufacture new issues after each such continuance. In any event, most of that work is now complete, and Sprint can hardly be heard to complain about the little work remaining as the need for that work was caused by Sprint itself.

The one thing that is certain is that if this case is stayed, Sprint will find more work for the parties and the Court to do in the future. It will make new motions, seek to add new and different

---

[1] Of course, if the objective was to encourage settlement of this case, that interest too would be best served by keeping the parties' feet to the fire and not staying the case.

The Honorable William C. Bryson
Page 4

witnesses, identify new purported claim construction disputes, request new PTO proceedings – the list goes on and on – all to try to avoid the next scheduled trial date. Substantial work will be saved by proceeding with the November 15 trial.

Finally, Sprint contends that the case should be stayed in view of the "health risk" to all involved due to the pandemic. (D.I. 592 at 1, 5.) In fact, at least eight jury trials have been conducted in the District of Delaware in 2021, all without any reported adverse health consequences. Sprint's concern about health risks rings particularly hollow in view of the fact that in the Second Case, pending before Judge Andrews, Sprint recently proposed that trial be "set for the earliest available setting in 2022." Whatever "health risks" remain due to the pandemic, they will be the same on January 3, 2022 as they will be on November 15, 2021. As it was in 2020, Sprint is quick to profess concern about health risks in order to postpone this trial, but it insists that the Second Case proceed to trial with all due haste.

**C. The Reexam Likely Will *Not* Simplify The Issues For Trial**

Sprint contends that "[g]ranting the stay is likely to eliminate the need for trial entirely" because PTO statistics indicate that "[i]n approximately 80% of instituted *ex parte* reexaminations, the claims are cancelled *or amended*." (D.I. 592 at 3-4.) The one simply does not follow from the other. The percentage of claims amended during reexams is irrelevant. The need for the trial in this case will be eliminated only if both claims of the '488 patent are cancelled. Using the very PTO statistics on which Sprint relies (*Id*. fn. 1), those odds are only 14.2%.

Sprint's error is assuming that, in the 64.4% of cases where the claims are "amended" instead of "cancelled," that is an adverse result for the patentee. There is no basis for that assumption. Patentees may welcome claim amendments, particularly during litigation, because it gives them the opportunity to narrow the claims so as to avoid the prior art relied on by the infringer while at the same time covering the infringer's product. That would explain why the statistics for outcomes in patent-owner initiated reexams are similar to the outcomes in 3rd party requester reexams. In both cases, the claims are "cancelled or amended" a little under 80% of the time, with about the same breakdown between cancelled and amended claims. *That does not mean the patent owner lost 80% of the time.* It means the patent owners wanted narrower claims. Patent owners would not request reexamination if they lost 80% of the time.

The fact that claim "amendments" do not equate to patent owner losses is confirmed by the fact that, as the statistics relied on by Sprint show, the PTO initiates reexamination in *92.2% of the cases in which it is requested*. It is so easy to initiate a reexam that, in the words of former Federal Circuit Chief Judge Michel, initiation of a reexam is "meaningless" to the merits because "[a]ny patent lawyer worth his salt can raise a substantial new question in virtually every case."[2] As Sprint interprets the statistics, nearly every request for reexam is granted, and nearly every reexam that is granted results in a patentee loss. In other words, almost every patent defendant can win its case simply by requesting reexam. To even state that proposition is to reject it.

Sprint suggests that it is significant here that the PTO issued an initial office action rejecting the claims of the '488 patent after the reexam was instituted. To the contrary, in the words of Judge Andrews, that "doesn't really mean anything." A first office action rejection after a reexam is instituted is a virtual certainty, as the PTO would not find the existence of a substantial new

---

[2] http://www.uspto.gov/aia_implementation/hearing-feb11.pdf (last visited Sept. 28, 2021).

The Honorable William C. Bryson
Page 5

question of patentability only to then determine that the claims are valid. As Judge Andrews recently explained when addressing a motion for a stay on numerous different grounds, one of which was a rejection of all pending claims by the PTO in a reexam:

> [R]ejections at this stage are commonplace and so it doesn't really mean anything. If the only thing that we're going on here were the ex parte re-exam and, you know, you filed a motion saying, Well, the Patent Office rejected every claim, I would say, Let's keep going ahead… ex parte re-exams were starting to be pretty infrequent by shortly after I became a judge, but I don't think the court was in the process or business of staying cases just because of the ex parte re-exams.

Transcript of Oral Argument at 25, *Wilson Wolf Mfg. Corp. v. Sarepta Therapeutics, Inc.*, C.A. No. 19-2316-RGA, D.I. 60 (D. Del. Sep. 1, 2021).

There is no reason to believe that the claims of the '488 patent will be among the minority of claims that are cancelled during reexam. Only one of the two claims is rejected based on anticipation. The other is rejected for obviousness based in part on a patent that Sprint originally asserted in this litigation but later dropped. The PTO can be expected to ultimately withdraw that rejection for the same reasons Sprint dropped that reference from this case.

The fact is, Sprint's failure to obtain institution of an IPR portends the eventual PTO confirmation of both claims of the '488 patent after reexamination. Sprint undoubtedly presented the best prior art it had in its petition for institution of an IPR. Applying the applicable "reasonable likelihood that the petitioner would prevail" standard, the PTO refused even to institute the IPR. It is highly unlikely that Sprint's desperate search for new prior art almost five years after this case started uncovered anything better than it already had. The only reason Sprint achieved institution of reexamination is because the standard is mere demonstration of a "substantial new question of patentability," a far lower standard than the IPR "reasonable likelihood" standard. Thus, while Sprint's basis for this motion is its contention that it is "exceedingly likely" that the '488 claims will not survive reexamination, that contention is belied by its inability even to satisfy the "reasonably likely" standard applicable to IPRs.

### III.  CONCLUSION

For all of the above-stated reasons, Sprint's motion for a stay should be denied.

Respectfully,

*/s/ Kelly E. Farnan*

Kelly E. Farnan (#4395)

cc: Counsel of Record (via CM/ECF)